# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br><br><br>ABS MANAGER, LLC and GEORGE CHARLES CODY PRICE,<br><br>　　　　　Defendants,<br><br>ABS FUND, LLC [ARIZONA]; ABS FUND, LLC [CALIFORNIA]; CAPITAL ACCESS, LLC; CAVAN PRIVATE EQUITY HOLDINGS, LLC; and LUCKY STAR EVENTS, LLC,<br><br>　　　　　Relief Defendants. | CASE NO. 13cv319-GPC(JMA)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND FOR AN ORDER PARTIALLY FREEZING ASSETS OF ABS MANAGER AND THE FUNDS, PRESERVING DOCUMENTS AND REQUIRING AN ACCOUNTING; AND DENYING PLAINTIFF'S MOTION FOR AN ORDER FREEZING ALL FUNDS' ASSETS AND PERSONAL ASSETS; AND AN ORDER APPOINTING A RECEIVER**<br><br>**[Dkt. No. 5.]** |

Before the Court is Plaintiff's motion for preliminary injunction and an order freezing assets, appointing a receiver, preserving documents and requiring an accounting. (Dkt. No. 5.) Defendants filed an opposition on March 6, 2013. (Dkt. No. 25.) Plaintiff filed a reply on March 11, 2013. (Dkt. No. 28.) On March 15, 2013, Defendants filed a sur-reply. (Dkt. No. 29.) A hearing was held on

March 19, 2013. (Dkt. No. 30.) Lynn Dean, Esq. and Sam Puathasnanon, Esq. appeared on behalf of Plaintiff and Timothy Pestotnik, Esq. and Mark Chester, Esq. appeared on behalf of Defendants. After a review of the parties' briefs, applicable law, hearing oral argument, and Defendants' consent to some of the relief sought, the Court GRANTS Plaintiff's motion for a preliminary injunction and an order freezing the assets of ABS Manager and the Funds, with the exception of distributions to non-affiliated investors[1] as calculated by the Funds' third-party accountant, and with five (5) business days notice to the SEC; and GRANTS Plaintiff's motion prohibiting the destruction of and requiring the preservation of documents; and requiring an accounting. The Court also DENIES Plaintiff's motion for an order freezing Price's personal assets and all the Funds' assets. The Court also DENIES Plaintiff's motion for an order appointing a receiver.

**Background**

On February 8, 2013, Plaintiff Securities and Exchange Commission ("SEC") filed a complaint along with an *ex parte* application for a temporary restraining order ("TRO") and order freezing assets; appointing a receiver over defendant ABS Manager, LLC and the entities it controls and manages; prohibiting the destruction of documents; granting expedited discovery; and requiring an accounting. (Dkt. Nos. 1, 2.) The SEC also filed an *ex parte* application, without notice, for an order temporarily sealing the entire file until the asset freeze is served or until February 26, 2013, whichever is sooner. (Dkt. No. 2.) The complaint alleges violations of sections 206(a) and 206(2) of the Investment Advisors Act of 1940; violation of section 206(4) of the Investment Advisors Act of 1940 and Rule 206(4)-8; violations of section 17(a) of the Securities Act of 1933; violations of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; and violations of section 20(a) of the Securities Exchange Act of 1934. (Dkt. No. 1.)

On February 11, 2013, the Court denied Plaintiff's *ex parte* application for TRO and denied Plaintiffs' *ex parte* application to temporarily file entire case under seal. (Dkt. No. 3.) On February 19, 2013, Plaintiff filed a motion for preliminary injunction along with an *ex parte* motion to shorten time for hearing on the motion for preliminary injunction. (Dkt. No. 5.) After briefing by both parties,

---

[1] At the hearing, affiliated investors were identified as Charles Code Price; ABS Manager, LLC; ABS Manager LLC 401(k); and Cavan Private Equity Holdings, LLC. The Court also includes Derek Price, Defendant Price's brother, as an affiliated investor.

on February 27, 2013, the Court granted Plaintiffs' *ex parte* motion and set the matter for hearing. Plaintiff seeks to enjoin Defendants from committing violations of the antifraud provisions of the federal securities laws. It also moves for an order freezing assets, appointing a receiver, preserving documents and requiring an accounting.

In opposition, Defendants consent to the preliminary injunction and portions of other relief sought by Plaintiff. (Dkt. No. 25 at 7.) They also consent to relief not sought by the SEC. Specifically, Defendants consent to a preliminary injunction against future violations of Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5; and Sections 206(1), 206(2), and 206(4) of the Advisers Act (Commission's Proposed Order at Sections II, III, IV, and V). Defendants also agree to an asset freeze over the assets of ABS Manager and the Funds[2], but not over Price's personal accounts or over distributions to non-affiliated investors, (id. Sections VI and VII); and agree to an order prohibiting the destruction of and requiring the preservation of documents, and an order requiring an accounting, (id. Sections IX, XX and XVIII).

Defendants consented to relief not even requested by the Commission which include an order prohibiting Price, ABS Manager and the Funds from accepting any additional investment into the Funds or any other investment vehicle from non-affiliated investors pending resolution of this matter on the merits; and an order prohibiting Price, ABS Manager and the Funds from making any distribution or paying any management fees, except allowing them to make distributions to non-affiliated investors as expressly calculated by the Funds' third-party accountant, with five business days advance notice to the Commission. (Dkt. No. 25 at 7.)

According to Plaintiff, two disputed issues remain. First, whether all of ABS Manager and the Funds' assets and Price's personal assets should be frozen. Second, whether a receiver should be appointed over ABS Manager and the Funds.

**Factual Background**

According to the Complaint Defendant George Charles Cody Price ("Price"), through his

---

[2] The Funds include the Relief Defendants: ABS Fund, LLC in Arizona ("ABS Fund"), ABS Fund, LLC in California ("Platinum Fund"), and Capital Access, LLC in Nevada ("Capital Access Fund"). (Dkt. No. 1, Compl. ¶ 2.)

1  unregistered investment advisory company, Defendant ABS Manager, LLC ("ABS Manager"), raised
2  about $18.8 million dollars from about 35 investors nationwide to invest in three funds (collectively
3  known as the "Funds") - Relief Defendants ABS Fund, LLC in Arizona ("ABS Fund"), ABS Fund,
4  LLC in California ("Platinum Fund"), and Capital Access, LLC in Nevada ("Capital Access Fund").
5  (Dkt. No. 1, Compl. ¶ 2.)

6   In March 2009, Defendant Price formed ABS Manager and continues to operate and control
7  the firm today. (Dkt. No. 5-3, Doran Decl., Ex. 1 at 6 (ABS Fund Private Placement Memorandum
8  ("PPM"), Ex. 2 at 17 (Platinum Fund PPM); Ex. 3 at 9-10 (Capital Access Fund PPM); Dkt. No. 15-1,
9  Price Decl. ¶ 3.)

10   For each fund offering, Defendants distributed a Private Placement Memorandum, ("PPM"),
11  which described the terms of each Fund's offering. (Dkt. No. 1, Compl. ¶ 22.) Starting in March
12  2009, Defendants first offered investment in the ABS Fund. (Id. ¶ 23.) ABS Fund's PPM stated that
13  the proceeds from its offering would be used to purchase collateralized mortgage obligations
14  ("CMOs"). (Id.) CMOs are mortgage based securities that pay the investors, depending on the "class"
15  or "tranche" of CMO they hold, the cash flows generated from the principal and interest payments on
16  a pool of mortgages. (Id. ¶ 3.) However, the Funds did not buy ordinary CMOs but bought "Interest
17  Only ("IOs") and "Inverse Interest Only" ("Inverse IOs") CMO tranches. (Id. ¶ 4.) These types of
18  CMOs are among the riskiest forms of CMOs. (Id.) They only receive interest payments from the
19  underlying mortgages and not the principal. (Id.) As the mortgages in the pool are prepaid, paid
20  down, re-financed or defaulted, the interest-only income stream from those mortgages stop. (Id.)

21   Since at least 2010, Defendants have claimed that the ABS Fund earned annual returns of 18%
22  and the Platinum Fund and Capital Access Fund would earn annual returns of 12.5%. (Dkt. No. 5-3,
23  Doran Decl., Ex. 2 at 13; Ex. 3 at 3, 14.) The investors' monthly account statements indicate that each
24  CMO held in the Funds was performing at 18% or better or 12% or better. (Id., Ex. 19 at 2-6; Ex. 20
25  at 2-4; Ex. 21 at 2-4; Ex. 22 at 2-3.) Moreover, in an October 2010 email to investors, Price wrote that
26  all bonds were making well over 18% and as of January 2013, the Capital Access Fund website shows
27  monthly returns of 1.04% (12.5% annualized) from January 2010 through June 2012. (Id., Ex. 35 at
28  1; Ex. 12 at 10.)  Lastly, on radio shows, Price stated that the Funds earned "extraordinary" and

"double-digit" returns. (Id., Ex. 6 at 23, 32.)

Plaintiff alleges that the representations about the Funds' performance were false and misleading because the Funds were not performing at these rates of return. From 2010 to 2012, although the Funds received interest payments from the securities they held in excess of 12% to 18%, the underlying value of these securities decreased significantly during this time. (Dkt. No. 5-2, Shau Decl. ¶¶ 6-8.) According to the SEC's analysis, in 2010, 2011 and 2012, the IOs and Inverse IOs that the Funds owned lost significant value. (Id.) Their annual returns never exceeded 3% and some investments had a return of negative 2%. (Id. ¶ 6.)

In order to attract investors, Defendants claims that these securities were "very safe", "secure" and "government bonds." (Dkt. No. 5-3, Doran Decl., Ex. 6 at 12, 24, 30-32; Ex. 17 at 2.) The PPM's also stated that the they were government backed bonds CMOs. (Id., Ex. 1 at 6; Ex. 2 at 11, 24; Ex. 3 at 7.) Defendants solicited investors through newspaper advertisements, radio infomercials, websites, and mass-mailers. (Id., Ex. 6 (radio transcript); Ex. 12 (website); Ex. 13 (newspaper ad); Ex. 14 (mass-mailers).) From November 2010 through January 2011, Price regularly co-hosted a radio infomercial called "The Wealth Weekend Hour," which aired on KFMB Radio in San Diego, California. (Id., Ex. 6.) On these shows, Price recommended that listeners invest in ABS Fund and invited listeners to contact him for a free portfolio review and if ABS Fund was not "right for you" then he would refer the listener to another professional. (Id. at 14, 25-26.)

Moreover, the Funds were only required to pay a management fee to ABS Manager if their returns exceeded 12.5% or 18%. (Dkt. No. 5-3, Doran Decl., Ex. at 8; Ex. 2 at 17; Ex. 3 at 9; Ex. 6 at 24.) No fees should have ever been paid during this period because the actual annual returns never exceeded 3%. (Dkt. No. 5-2, Shau Decl., ¶ 10.) However, Defendants caused the Funds to pay Price and ABS Manager about $578,402 of Fund Assets during this time.[3] (Id.) Moreover, a substantial portion of it was distributed to Defendants Cavan Private Equity Holdings, a company owned by Price,

---

[3]There is a dispute as to $332,100 of the alleged misappropriation of management fees by Defendants. SEC claims that $332,100 was improperly paid to ABS Manager as compensation and provides a copy of a withdrawal slip signed by Price. (Dkt. No. 20-9, Supp. Shau Decl., Ex. 1.) Price states that he withdrew $332,100 for a client disbursement which was not made for his benefit and provides copies of bank statements showing the withdrawal and deposit of that amount on May 1, 2012. (Dkt. No. 15-1, Price Decl. ¶ 9; Dkt. No. 21, Suppl. Price Decl. ¶ 6; Exs. E, F.)

1 and Lucky Star Events, LLC, a company owned by Price's wife. (Dkt. No. 1, Compl. ¶¶ 53-58.)
2 Lastly, in radio shows and in the PPM for the Funds' offerings, Defendants misrepresented Price's
3 professional experience and grossly inflated the amounts of funds under management. (Id. ¶ 7.)

4 In response, Price states the Funds began operating in 2009. (Dkt. No. 15-1, Price Decl. ¶ 3.)
5 He has hired a staff of licensed professionals as well as outside professional to provide legal, financial,
6 accountant and administrative services to the Funds. (Id. ¶ 4.) The Funds obtained U.S. government
7 issued agency (interest only) CMOs which were purchased through brokerage accounts maintained by
8 the Funds with licensed broker dealers. (Id. ¶ 6.) Most are held in a brokerage account with Morgan
9 Stanley Smith Barney[4] and Capital Securities. (Id.) There are around 35 agency CMOs in those
10 accounts. (Id.)

11 Each month, the cash that has accrued is distributed to the investors, pro rata, on a monthly
12 preferred return basis, according to the terms of the PPM which provides a specific formula to be used.
13 (Id. ¶ 7.) The calculations are provided by a third-party accounting professionals who have complete
14 access to the brokerage accounts. (Id.) The Funds, through ABS Manager, distribute the accumulated
15 monthly interest to the investors according to the accountant's spreadsheets. (Id.) The accounting
16 firms then send monthly account statements to each investor which show distributions and the
17 investor's monthly membership interest account statements. (Id. ¶ 7.)

18 The outside accounting firm also calculates the compensation that ABS Manager is entitled
19 to receive each month after distributions are made to the Fund's investors. (Id. ¶ 8.) ABS Manager
20 has consistently withdrawn less than what it was entitled to under the PPM. (Id.) The compensation
21 is used to pay the Funds' overhead and expenses and is used to purchase more agency CMOs for the
22 benefit of all members in order to add additional principal to the overall accounts. (Id.) Since
23 inception, the Fund has timely distributed monthly payments to its investors and has paid over
24 $3,257,000 to investors during this time. (Id. ¶ 9.)

25 Defendants argue that the parties disagree about the valuation of the underlying assets held by

---

[4] Around February 25, 2013, Morgan Stanley demanded immediate payment of the credit line balance in the ABS account and began liquidating the CMS in order to repay itself the credit line balance. (Dkt. No. 21, Suppl. Price Decl. ¶ 5.) As of March 2013, Morgan Stanley completed liquidating the securities the had been pledged to satisfy the credit facility it had offered ABS Manager and there was a shortfall of $18,000. (Dkt. No. 28-2, Second Suppl. Dean Decl. ¶ 7.)

1 the Funds. They argue that SEC incorrectly conflates its view of the value of underlying assets in the
2 Funds with the investor's ownership interest in units of the Funds. However, the two are not the same
3 and must be resolved on the merits later at trial or summary judgment. It is a "technical dispute about
4 the estimates of the value of esoteric securities that trade in an opaque market." (Dkt. No. 25, Ds' Opp
5 at 5.)

**Discussion**

7 Defendants consent to the relief sought by Plaintiff seeking a preliminary injunction. They also
8 consent to a freeze of the Funds' assets, and an order prohibiting the destruction of and requiring the
9 preservation of documents, and an order requiring an accounting. Accordingly, the Court GRANTS
10 Plaintiff's unopposed motion for preliminary injunction and assets of ABS Manager and the Funds,
11 with the exception of distributions to non-affiliated investors as calculated by the Funds' third-party
12 accountant, with five (5) business days notice to the SEC and GRANTS Plaintiff's unopposed motion
13 prohibiting the destruction of and requiring the preservation of documents, and requiring an
14 accounting. The remaining issues are whether the Court should impose an asset freeze on all assets
15 of ABS Manager and the Funds and Price's personal assets and whether a receiver should be appointed
16 over ABC Manager and the Funds.

17 **A.    Asset Freeze**

18 Defendants agree to a freeze of the Funds' assets with the exception of "distribution to non-
19 affiliated investors" as expressly calculated by the Fund's third-party accountant, with five business
20 days advance notice to the SEC. Plaintiff seeks an asset freeze over all the Funds' accounts because
21 there are still assets held by the Funds that must be preserved and managed for the benefit of investors
22 and Defendants have already improperly redeemed certain investors the full value of their investment
23 to the detriment of other investors. Second, Plaintiff seeks an asset freeze over Price's personal assets
24 because he has improperly collected management fees which may be transferred away beyond the
25 reach of the Court. Plaintiff seeks at a minimum a freeze over any management fees held personally
26 by Price. Defendants argue that an asset freeze is no longer necessary as they agreed to a freeze of the
27 Fund's assets.
28 "Generally, federal courts enjoy wide discretion in fashioning relief and protective measures

in SEC actions." In re San Vicente Med. Partners Ltd., 962 F.2d 1402, 1406 (9th Cir. 1992); but see SEC v. Hickey, 322 F.3d 1123, 1131 (9th Cir. 2003) ("[T]he exercise of the district court's broad power to fashion ancillary relief [can] be exercised only where necessary."). "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009) (finding likelihood of dissipation of assets where defendant had convinced his fellow directors and trustees to consent to diverting nearly $35 million from the company's account into his personal bank account); see also SEC v. Schooler, –F. Supp. 2d– , 2012 WL 4761917, at *15  (S.D. Cal. Oct. 5, 2012) (J. Burns) (SEC must show that Defendants are likely to dissipate their own assets along with those of the general partnerships).

SEC's arguments that an asset freeze over the Funds' accounts is still needed as there are still assets held by the Funds to be managed and Defendants have already redeemed certain investors to the detriment of others are now moot. Defendants have agreed to a freeze of the Funds' assets so concerns that assets will be misappropriated or that more investors may be paid out are no longer at issue. Moreover, as to the SEC's contention that Defendants have already paid some investors the full amount of their investment to the detriment of others, such action is not improper or illegal. SEC v. Schooler, 2012 WL 4761917, at *25 (even if "hush money" was distributed, it still went to a recipient with a rightful claim to it and does not show a likelihood of dissipation of assets or waste.).

As to Price's personal assets, SEC seeks to freeze his personal assets to prevent the dissipation of assets and ensure their availability for the benefit of defrauded investors, or at a minimum, the SEC seeks a freeze over any management fees personally held by Price. Price objects to a freeze of his personal assets because he has to provide for himself, his wife and two children and has invested heavily in the Funds. (Dkt. No. 25-1, Price Second Suppl. Decl. ¶ 6.)

The SEC has been conducting an investigation of the Funds since May 2012. (Dkt. No. 15-1, Price Decl. ¶ 15.) Price has cooperated in the SEC's investigation.[5] (Id. ¶¶ 15-17.) In support of its

---

[5] SEC argues that Defendants have not fully complied with the SEC's July 25, 2012 subpoena. (Dkt. No 20-2, Dean Suppl. Decl. ¶ 6; Ex. 3.) However, in a late response, Defendants' counsel provided a response as to remaining issues in the subpoena. (Id., Ex. 4.) While there may have been delays in responding to the SEC's subpoena requests, Price has not been uncooperative. At the

motion to freeze assets, the SEC has offered no evidence that Defendant Price will likely dissipate his own personal assets or the corporate assets. F.T.C. v. Millennium Telecard, 2011 WL 2745963, at *13 (D. N.J. July 12, 2011) (Plaintiff failed to show that despite one year long investigation, government has only been able to provide a single incident of "financial impropriety" - three bounced checks from 2009); FTC v. Affordable Media, LLC, 179 F.3d 1228, 1236 (9th Cir. 1999) (district court made a clear finding that defendants will conceal, dissipate or otherwise divert their assets based on defendants' history of diverting their commissions away to a Cook Islands trust). Accordingly, the Court DENIES Plaintiff's request for an asset freeze on Price's personal assets and a freeze on all the assets of ABS Manager and the Funds.

**D.     Receiver**

Plaintiff seeks the appointment of a receiver over ABS Manager and the Funds to protect the Funds from further dissipation and the misappropriation of assets. Defendants object to the appointment of a receiver as unnecessary and harmful to the investors. Specifically, Defendants argue that their consent to the preliminary injunction and other measures will protect the investors in the Fund. They further assert a receiver will impose unnecessary costs on the Funds as the proposed receiver seeks to employ a team of professionals to conduct an investigation of the Funds. They contend that all of the Funds' assets are held by independent, third-party custodians and the accounting is being handled by a qualified, independent, third-party public accounting firm.

"As part of the Court's equitable powers under the Securities Acts of 1933 and 1934, it may impose receiverships in securities fraud actions to prevent further dissipation of defrauded investors' assets." SEC v. Wencke, 783 F.2d 829, 937 n. 9 (9th Cir. 1986). The appointment of a receiver is considered to be an extraordinary remedy and should be granted only when clearly necessary. Citibank v. Nyland, Ltd., 839 F.2d 93, 97 (2d Cir. 1988). "A receivership is justified where there is a need to (1) marshal and preserve assets from further misappropriation and dissipation; (2) clarify the financial affairs of an entity for the benefit of investors; (3) allow the receiver to conduct an independent investigation of claims an entity might have against former management or other parties; and/or (4)

---

hearing, it was further noted that Defendants provided documents to the SEC in response to the subpoena and all that is at issue is a broad request for all emails that will take time to retrieve.

1  discover and assert defenses against actions brought against an entity." <u>SEC v. Schooler</u>, No.
2  12cv2164-GPC(JMA), at 6 (S.D. Cal. Nov. 30, 2012) (<u>citing</u> <u>SEC v. Wencke</u>, 622 F.2d 1363, 1372
3  (9th Cir. 1980)). A receivership may also be justified where management of an entity, collection of
4  revenue, and/or the proper distribution of investor funds are required. <u>See</u> <u>Sec. & Exch. Comm'n v.</u>
5  <u>Fifth Ave. Coach Lines, Inc.</u>, 289 F. Supp. 3, 42 (S.D.N.Y. 1968) (defendant needed a strong
6  independent management to lead company out of its difficulties, clean up the past and prepare for the
7  future); <u>SEC v. Credit First Fund, LP</u>, No. CV05-8741 DSF(PJWx), 2006 WL 4729240, at *15 (C.D.
8  Cal. Feb. 13, 2006).

9        Plaintiff contends that it is critical that the Court appoint a receiver to marshal and preserve
10 existing assets from further dissipation and ensure that Defendants do not further misappropriate
11 assets. Defendants argue that they will consent to an order prohibiting them from paying management
12 fees and agreed to a freeze of the Funds' assets, with the exception of distribution to non-affiliated
13 investors with notice to the SEC. Therefore, this argument is without merit.

14       Plaintiff also argues that while Morgan Stanley has liquidated all of the Funds' CMOs pledged
15 as collateral for the credit facility, the Funds still hold securities with a different broker-dealer.
16 Because SEC claims it has established a prima facie case that Defendants committed securities fraud,
17 and the integrity of Defendants' management is at issue, a receiver is needed as the Funds need
18 oversight and management by an independent party. The Funds are held by a third party broker and
19 the distribution calculations are conducted by a third party accountant. The integrity of these third-
20 party professionals have not been questioned. At the hearing, Defendants stated that while Price
21 oversees the operation, he is not involved in the day to day management of the Funds. Moreover,
22 Defendants consent to the preliminary injunction sought by Plaintiff and other additional relief.
23 Therefore, based on these factors, it does not appear that Price will be an active manager of the Funds.
24       Plaintiff also argues that a receiver is needed to clarify the interests of investors as Price has
25 shown that he hides the truth from investors. For example, as recently as January and February 2013,
26 he spoke with the investors by phone but failed to disclose the ongoing SEC investigation or what was
27 going with Morgan Stanley. In their sur-reply, Defendants argue that Price did not conceal the truth
28 from investors by failing to disclose the SEC investigation. At this time, there is no need to clarify the

1  interests of the investors or the financial affairs of the Funds.  Moreover, it would appear that the
2  interests of investors could be easily obtained from accounting records.

3        Plaintiff also claims that the investors are being treated differently as some investors were
4  already fully redeemed.  Since the assets have decreased in value by 26% over the past three years,
5  these redemptions favored the redeeming investors over those who did not redeem.  Again, this issue
6  is moot as Defendants have agreed to stop making any disbursements out of the Fund by agreeing to
7  a freeze of the Funds' assets.  Moreover, in their sur-reply, Defendants state that Price testified that
8  as to Mr. Nittoli, who redeemed 100% of his initial capital investment, ABS redeemed Nittoli by
9  purchasing his shares with funds from the ABS Manager reserve account, which is comprised of ABS
10 Manager's profits.  (Dkt. No. 29-1, Price Depo. at 196:3-197:3.)  The Funds' assets have not been
11 affected, at least with regards to the distribution made to Nittoli.

12       Plaintiff has failed to demonstrate the factors needed to appoint a receiver.  Many of the
13 concerns raised by Plaintiff are addressed by a freeze of the assets of ABS Manager and the Funds.
14 Moreover, the costs involved in appointing a receiver and hiring other  professionals to investigate
15 would only further dissipate the assets of the investors.  Accordingly, at this time, the Court DENIES
16 Plaintiff's motion for an order appointing a receiver.

17 **Conclusion**

18       Based on the above, the Court GRANTS Plaintiff's motion for a preliminary injunction and
19 an order freezing the assets of ABS Manager and the Funds, with the exception of distribution to non-
20 affiliated investors[6] calculated by the Funds' third-party accountant, and with five (5) business days
21 notice to the SEC; and GRANTS Plaintiff's motion prohibiting the destruction of and requiring the
22 preservation of documents; and requiring an accounting.  (See Commission's Proposed Preliminary
23 Injunction Order at Sections II, III, IV, V, VI, VII, IX, XX, and XVIII.)  The Court DENIES Plaintiff's
24 motion for an order freezing Price's personal assets and all the Funds' assets.  The Court also DENIES
25 Plaintiff's motion for an order appointing a receiver.

26       No later than seven days after the date this Order is entered, the SEC and Defendants shall

27
28     [6] Affiliated investors include the following: Charles Code Price; ABS Manager, LLC; ABS Manager LLC 401(k); Cavan Private Equity Holdings, LLC; and Derek Price.

1  meet and confer, and then serve and lodge, via email (efile_curiel@casd.uscourts.gov) a proposed
2  preliminary injunction order, in WordPerfect or Word format, that is consistent with this Order.
3      IT IS SO ORDERED.

5  DATED:  March 20, 2013

                                       _____
                                       HON. GONZALO P. CURIEL
                                       United States District Judge