```
 1                    UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3
     SECURITIES AND EXCHANGE       .
 4   COMMISSION,                   .
                                   . Docket
 5              Plaintiff,         . No. 13-cv-0319-GPC
                                   .
 6                   v.            . March 19, 2013
                                   . 1:30 p.m.
 7   ABS MANAGER, LLC AND GEORGE   .
     CHARLES CODY PRICE, et al.,   .
 8                                 .
                Defendants.        . San Diego, California
 9   . . . . . . . . . . . . .

10                  TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE GONZALO P. CURIEL
11                  UNITED STATES DISTRICT JUDGE

12                     A-P-P-E-A-R-A-N-C-E-S
     For the Plaintiff:     U.S. Securities and Exchange Commission
13                          5670 Wilshire Boulevard
                            11th Floor
14                          Los Angeles, California 90036
                            By:  LYNN M. DEAN, ESQ.
15                               SAM S. PUATHASNANON, ESQ.

16   For the Defendants:    Pestotnik & Gold, LLP
                            501 West Broadway, Suite 1025
17                          San Diego, California 92101
                            By:  TIMOTHY R. PESTOTNIK, ESQ.
18
                            – AND –
19
                            Chester & Schein PC
20                          8777 North Gainey Center Drive
                            Suite 191
21                          Scottsdale, Arizona 85258
                            By:  MARK D. CHESTER, ESQ.
22
     Court Reporter:        Chari L. Possell, RPR, CRR
23                          USDC Clerk's Office
                            333 West Broadway, Suite 420
24                          San Diego, California 92101
                            chari_possell@casd.uscourts.gov
25   Reported by Stenotype, Transcribed by Computer
```

```
 1              SAN DIEGO, CALIFORNIA; MARCH 19, 2013; 1:30 P.M.

 2                              -o0o-

 3          THE CLERK:  Number 1 on calendar, case 13-cv-0319,

 4   Securities and Exchange Commission versus ABS Manager, LLC,

 5   et al., for a motion hearing.

 6          THE COURT:  Appearances, please.

 7          MS. DEAN:  Your Honor, my name is Lynn Dean.  I am

 8   representing the Commission here today.  I also have with me my

 9   colleague, Sam Puathasnanon.

10          MR. PESTOTNIK:  Good afternoon, Your Honor.  Tim

11   Pestotnik of Pestotnik & Gold on behalf of defendants.  With me

12   today is Mark Chester from Arizona, who is also here in court

13   today.

14          THE COURT:  Good afternoon.  We are here on a hearing

15   requesting a preliminary injunction.  The Court has reviewed

16   the pleadings and the papers that have been filed in this

17   matter, including the motion for preliminary injunction filed

18   on February 19; the memorandum of points and authorities in

19   support of Securities and Exchange Commission's motion filed

20   February 19 and supporting documents; plaintiff Securities and

21   Exchange Commission's recommendation that the Court appoint

22   David Stapleton as receiver filed February 19; the declaration

23   of Carol Shau in support of Securities and Exchange

24   Commission's motion for preliminary injunction filed

25   February 19; the opposition that was filed by the defendants;
```

1  and the reply memorandum filed by the government on March 11;

2  and the surreply filed by the defense on March 15.  There was

3  also a second supplemental declaration of George Price filed on

4  March 6.

5      And at this point, it appears that we have whittled down

6  the issues before the Court.  As I understand it, the defendant

7  is prepared to agree to a preliminary injunction on a host of

8  requests including an accounting, preservation of evidence,

9  agreeing to certain restraints that have been proposed.  And

10  that basically what still at issue are requests for the

11  freezing of personal assets and an exception to a freezing of

12  corporate assets, as well as the appointment of a receiver.

13      And I have some questions that I would like to ask

14  regarding both the request for the receiver and the request for

15  a freeze.

16      As I understand one of the arguments that has been made by

17  the plaintiff, they argue that a receiver is needed to marshal

18  and preserve existing assets from dissipation.  And my question

19  is given the consent that has been offered to a preliminary

20  injunction in a number of particulars, at this point how do you

21  at this point that the defendant -- either of the defendants --

22  would be in a position to continue to misappropriate assets?

23          MS. DEAN:  Your Honor, the defendants are still in

24  control of certain assets of ABS Manager, which in turns holds

25  securities for the benefit of investors in the fund.  Although

1   they have consented to entry of the preliminary injunction, the

2   one thing they have refused to consent to is any relief that

3   would remove the defendant Mr. Price or ABS Manager from

4   control of the company.  And it is the government's position,

5   the Securities and Exchange Commission's position, that

6   Mr. Price is not a trustworthy monitor of these investor assets

7   given the pattern of conduct that has occurred with respect to

8   the investments, and also certain representations that have

9   been made thus far in the course of the investigation and the

10  litigation.  And I can provide Your Honor with some examples of

11  that if that would be helpful to you.

12         THE COURT:  Well, I think what I am looking for is

13  how do you see that Mr. Price would be an active manager of the

14  funds day to day and what actions would he be able to take

15  given the consent to any number of restraints by the defense?

16         MS. DEAN:  Well, in the absence of a receiver, as I

17  said, Mr. Price would still have control over the active

18  day-to-day management of ABS Manager and the funds.

19         THE COURT:  But with a number of significant

20  limitations; is that correct?

21         MS. DEAN:  That is true, although the defendants have

22  requested a carve-out for continuing distributions to

23  investors.  The Commission is very concerned about the

24  possibility that certain investors have been and may in the

25  future be benefited at the expense of others.

1      THE COURT:  But even as far as the carve-out,

2  wouldn't that be a carve-out that would be subject to or made

3  by a third-party accountant?

4      MS. DEAN:  No, Your Honor.  Mr. Price would be in

5  control of whatever expenditures were being made of fund

6  assets.

7      THE COURT:  As I understand it, there would be an

8  exception of distribution to nonaffiliated investors as

9  expressly calculated by the fund's third-party accountant; is

10 there something beyond that?

11     MS. DEAN:  That's what they have said.  But, Your

12 Honor, our position is that we -- the Court and the SEC should

13 really not take Mr. Price's word for it.  Without a receiver

14 and without somebody in a position to actually monitor the

15 day-to-day activities here, there is a very real concern on the

16 Commission's part that Mr. Price will sell away assets that are

17 still held by ABS Manager or make distributions that benefit

18 either himself or other investors over the pool of investors as

19 a whole.

20     THE COURT:  All right.  But there's no dispute that

21 the funds are held by a third-party brokerage firm; is that

22 correct?

23     MS. DEAN:  Certain assets of the funds here in fact

24 currently held by a third-party brokerage firm.  However, in

25 Mr. Price's deposition, he also disclosed that there are funds

1   at ABS Manager which he described as fees that ABS Manager has

2   collected.  These are fees that the government would argue

3   ABS Manager was not actually entitled to given the fact that

4   the funds were not performing as promised.

5        Mr. Price represented in his deposition that certain of

6   those funds have been placed in what he referred to as a trust,

7   which is custody, as far as I can tell, at a bank account at

8   Wells Fargo Bank that is in the name of ABS Manager and not

9   with a third-party brokerage house.

10            THE COURT:  I stopped you in the middle of your

11   argument.  I don't know if you had an additional argument that

12   you wanted to raise at this time.

13            MS. DEAN:  Just what I started to say, Your Honor, is

14   that we have seen evidence from Mr. Price that he is basically

15   willing to say whatever is expedient in the moment.  For

16   example, Mr. Price submitted a declaration to this Court, on

17   February 27, in which he stated as of February 22, Morgan

18   Stanley had given no indication a liquidation of fund assets

19   was imminent.

20        In his deposition, at page 129, lines 14 through 18, after

21   being confronted with an e-mail he wrote on February 4,

22   Mr. Price admitted that his first notice that Morgan Stanley

23   intended to liquidate fund assets was actually on February 4.

24        Similarly, Mr. Price made a representation in his

25   deposition to the effect that relief defendant Cavan Equity

1  Holdings has no investors.  That representation is at page 99,

2  lines 1 through 25 of the transcript.

3      And by the way, Your Honor, the transcript is in evidence

4  because defendants attached it to their surreply.  I handed

5  your clerk this morning some excerpted pages if Your Honor

6  wants to look at the pages that I am referring to.

7      So at page 99, Mr. Price testified that the relief

8  defendant Cavan Equity Holdings had no investors, but in the

9  declaration of Morgan Ward Doran that the Commission submitted

10 with its motion for preliminary injunction, Exhibit 5, which is

11 an Excel spreadsheet provided to the commission by ABS Manager

12 lists 11 Cavan Equity Holdings investors.

13      In his deposition, Mr. Price was confronted with a

14 May 2010 draft letter to certain ABS fund contractors in which

15 he represented that he would not be able to pay them because

16 ABS fund was upside down five percent in principal value.

17      At his deposition, Mr. Price testified that in fact that

18 statement was false; that he had decided to fabricate the

19 statement because he wanted to fire these people and, quote,

20 "didn't have the guts to do so."

21      Even if one takes that self-serving statement at face

22 value, Mr. Price just does not seem to be the sort of person

23 who should be responsible for protecting investor assets and

24 running a fund.

25      And the statements that I just referred to were

1    Mr. Price's deposition, page 214, line 5, through 215, line 1.

2        Mr. Price also apparently misrepresented the situation

3    with respect to the line of credit that the Capital Access fund

4    was offering to investors.  In December of 2012, he was

5    attempting to move assets that were currently custodied at

6    Morgan Stanley and looking for another broker dealer to take

7    custody.  He wrote an e-mail to the CEO of a broker dealer

8    where he represented that the line of credit that investors had

9    taken -- the various investors had taken at Capital Asset was

10   for the express purpose of making real estate investments.

11       Mr. Price then admitted to me in his deposition the loans

12   were general purpose loans, and that ABS Manager did not ask

13   its clients what they planned to do with the money they

14   borrowed.  Those statements are at Mr. Price's deposition

15   transcript at page 208, line 22, through 209, line 23.

16       Under the circumstances, the Commission is just not

17   confident that leaving Mr. Price in charge of investor assets

18   is the best course here.

19       One of the issues that we have is that it's impossible for

20   the Commission to know at this point what actual assets still

21   exist, so there is some real risk that assets may be being

22   dissipated that the Commission doesn't even know about.

23           THE COURT:  Hasn't the defendant or the defendants

24   agreed to an accounting?

25           MS. DEAN:  Again, Your Honor, they have.  And to the

1    extent that that accounting is done, as they represent it will

2    be, by a third-party, that would provide some comfort as to

3    where assets are located, but we don't have the accounting as

4    of today.

5              THE COURT:  Let me inquire, there was some indication

6    that there was an accounting being performed by Spicer Jeffries

7    to audit operations, and that there was an expectation that the

8    report would be forthcoming.  Have you seen anything from

9    Spicer Jeffries?

10             MS. DEAN:  We have not.  And apparently, that

11   representation has been made over a period of time.  It's

12   unclear to us -- I asked Mr. Price about it in his deposition.

13   He told me they had been retained back in October -- I believe

14   October.  I don't want to mislead the Court.  Might been

15   November.

16       In any case, they have been on the scene, according to

17   Mr. Price, for some months, and we have yet to see any sort of

18   report.

19             THE COURT:  Let me ask, has defendant agreed to a

20   prohibition on distributions to current investors?

21             MS. DEAN:  No, he has not.

22             THE COURT:  And I will be asking this same question

23   of the defense as to whether or not the defendant has agreed to

24   such a prohibition.

25       If there was such a prohibition, you are still of a

1    position that you need a receivership in order to monitor and

2    otherwise manage this concern?

3              MS. DEAN:  Well, yes.  As Your Honor is aware, a

4    receivership is a tool that is used to both marshal and

5    preserve assets, clarify the financial affairs of the company,

6    and make distributions to investors.

7        In this particular case, as I pointed out to the Court,

8    the only person who really knows what the assets of the funds

9    are right now is the defendant, Mr. Price.  We know that there

10   is a securities account at a brokerage house that has some

11   unknown number of assets of some unknown value, and it's

12   unknown to us only in the sense that we do not have the most

13   recent data.

14       And then there is this account at Wells Fargo Bank that we

15   have become aware of largely by way of Mr. Price submitting

16   copies of excerpts from account statements in conjunction with

17   this motion.  And then there's whatever funds are at ABS

18   Manager.

19       One of the things that happened in Mr. Price's deposition

20   he was unable to even tell Commission counsel how many offices

21   ABS Manager has, whether it's four, whether it's five, whether

22   there is an office in Dallas or not an office in Dallas.  He

23   apparently did not know.  And this is the person who wants to

24   continue to be able to run the affairs of this entity.

25             THE COURT:  All right.  Let me hear from the defense.

1    As a starting point, is the defendant or the defendants

2    agreeable to a prohibition on the distributions to current

3    investors?

4         MR. CHESTER:  Your Honor, I am sure that the

5    defendants would strongly consider that.  If I may give you a

6    very brief overview of that issue.

7         THE COURT:  Proceed.

8         MR. CHESTER:  And I have to just start with it's

9    appalling to me that the SEC can stand here and represent to

10   this Court that they are not sure where all the assets are.

11   And this flows right into the big picture of what I am

12   explaining to you.  And that is this is an entity, ABS Manager,

13   that runs two brokerage accounts.  It manages two brokerage

14   accounts, one at Morgan Stanley, that the Court has heard a lot

15   about, and the other Capital Securities.

16        THE COURT:  When you say it manages and otherwise

17   runs, what does it do day to day?

18        MR. CHESTER:  It is the account holder.  Simply put,

19   when account statements are generated by Morgan Stanley and

20   generated by Capital Securities, it says account holder,

21   ABS Manager.

22        And inside those accounts -- and I am not going to relate

23   it to one's own personal financial situation -- but very

24   similar to an individual account.  If an individual goes down

25   to a neighborhood brokerage firm to open an account, they say

1  how do you want to title it?  Your name, family name, IRA, what

2  have you.

3      That's what ABS Manager does.  They open the brokerage

4  accounts, and the investor money is used to purchase CMOs,

5  which I will called bonds, for simplicity today.

6          THE COURT:  So day to day, what type of discretion do

7  they exercise?

8          MR. CHESTER:  They don't have a whole lot of

9  discretion.  Because the way it works, the LLC, ABS Manager,

10  has these accounts with numerous bonds.  And almost every other

11  week -- about three times a month -- those bonds generate

12  income that go into the Morgan Stanley account and go into the

13  Capital Securities account.  And then, at the conclusion of the

14  month, Your Honor -- and I will show you a flow chart in a

15  little while -- there are two third-party companies that then

16  look at the brokerage accounts and they make determinations as

17  to distributions to investors based on the investor's original

18  agreement with the fund.

19      The third-party outside professionals then send over

20  spreadsheets indicating how much money is to be distributed to

21  each investor.  And included in that group of investors is

22  defendant Price, who has a significant amount of his own money

23  in the fund.  The testimony at his deposition was in excess of

24  $1.5 million of his own money in the fund.

25      Along with all of other -- and I will just simplify and

say 30 investors, at the end of each month, the outside

professional send over a sheet.  And they say, "We have looked

at the account statements of the brokerage firms, and at this

point, based on everyone's agreements, each investor is going

to get X amount," including Mr. Price and his entities.

And then what happens, Your Honor, is the money then flows

from the brokerage firms to the bank, where the fund has a bank

account, and just about every investor has a direct-deposit

situation, where the bank pays the investors.  That's all

handled by third-party, outside professionals.

And what happens is some of the money actually gets paid

to ABS Manager as compensation.

What we have proposed in the order before this Court is

that all distributions that used to be made to ABS Manager, as

compensation for its managing, be frozen.

THE COURT:  And let me ask this.  You referenced how

these outside professionals generate these reports and forward

them, or statements, and forward them to ABS; is that correct?

MR. CHESTER:  Yes.

THE COURT:  And who at ABS?  Is it Mr. Price?  Is it

somebody that works for him?  What is ABS?  Are we talking

about a large company, with hundreds of employees, or are we

just talking about a mom-and-pop shop of one or two

individuals?

MR. CHESTER:  Closer to the latter, half a dozen or

1   so, four or five people.  I believe there's one or two in

2   particular that forward the information to the bank as to how

3   to disseminate the funds to the various investors.

4           THE COURT:  As far as Mr. Price, does he play a role

5   in any of this process?

6           MR. CHESTER:  Other than overseeing it, no, Your

7   Honor, not that I am aware of.

8           THE COURT:  You may proceed.

9           MR. CHESTER:  Certainly.

10      The second part of the freeze of assets, or should I say

11  freeze of distributions, is if you can picture -- the money is

12  now sitting in the brokerage account.  It is the end of the

13  month.  All these interest payments have come in on bonds.

14  They are now going to be distributed to the investors.  And

15  also, some of the money is going to be distributed to Mr. Price

16  as an investor.

17      We have also agreed in the order -- and we used word

18  "affiliated" -- that no affiliated investors would receive a

19  distribution.  So, for example, Your Honor, you have a number

20  of investors that reside here and in Arizona that count on a

21  monthly interest check or dividend check from this fund every

22  month, and they will continue to receive it as long as it's

23  plausible for them to receive it.  Those numbers are prepared

24  by the third-party outside professionals, and it's calculated

25  to the nickel.  And that money is sent to those investors.

1    The proposed freeze would preclude Mr. Price and his

2  entities from receiving any distributions whatsoever, whether

3  it's in the form of investor dividends or whether it is in the

4  form of compensation for managing the fund, all until this

5  Court resolves the issue leading up to the merits.

6    THE COURT:  So this term or this expression,

7  "distribution to nonaffiliated investors as expressly

8  calculated by the fund's third-party accountant," nonaffiliated

9  investors, we are talking about individuals outside of

10  Mr. Price, and who else?

11    MR. CHESTER:  Any of his related entities.  In other

12  words, he has an account in his personal name.  He has an

13  account in, I believe, his IRA or 401(k).  And then he as an

14  entity called Cavan that also has an account.  And that totals,

15  I believe, roughly about 1.5 -- a little north of $1.5 million

16  of capital contribution.  Those would be frozen to the extent

17  that he and his related entities would receive no funds of

18  distributions until the Court so orders him.

19    THE COURT:  But otherwise, investors who have money

20  in the fund, they would be entitled to receive their interest

21  as calculated by the fund's third-party accountant?

22    MR. CHESTER:  Yes, Your Honor.  And that's really the

23  status quo in terms of preserving the assets for the benefit of

24  these investors that plaintiff alleges were deceived in one

25  way, shape, or form.

 1          The other carve-out, Your Honor, so I am not raising it at

 2    the end, is also the third-party outsiders would also let us

 3    know what expenses need to be paid to those outside third

 4    parties.  In other words, the accounting firm, administrative

 5    firm, they are not going to do this for free much longer.  They

 6    are going to also need to get paid on a monthly basis.

 7          THE COURT:  Thank you.

 8      Can I hear a reply or response?

 9          MS. DEAN:  Yes, Your Honor.

10      I just want to make the point that ultimately, all of the

11    third parties that Mr. Chester was referring to, third-party

12    brokerage houses, managers, accountants, ultimately their

13    contractual relationships are always with the defendant,

14    Mr. Price, and ABS Manager.  They are not involved in any sort

15    of contractual relationship with the investors.  So again, it's

16    Mr. Price who exercises control over the activities of those

17    individuals, entities.

18          THE COURT:  Let me ask you about that.  As I

19    understand it, the SEC has been involved in the investigation

20    since last May; is that correct?  Thereabouts.

21          MS. DEAN:  I believe that's correct.  I believe since

22    June, but possibly May.

23          THE COURT:  Since the investigation began, is there

24    any indication that any of the third-party professionals have

25    engaged in misconduct, have taken direction from Mr. Price or

1   ABS which has been demonstrated to be against the interest of

2   the investors or something that's askew that would cause the

3   Court to question whether or not they are in a position to

4   maintain the operation of this fund?

5              MS. DEAN:  Well, we were certainly not accusing

6   anyone, any of these third parties of collusive behavior or

7   misconduct at this point.  We don't have any evidence of that.

8        But what we do have evidence of is that Mr. Price has the

9   power to direct the sale and the transfer of fund assets.

10  Mr. Price testified about selling assets at the request of

11  Morgan Stanley at pages 57 to 58 of his deposition transcript.

12       He testified that he had sold certain assets because

13  Morgan Stanley was no longer comfortable having those assets

14  secure the line of credit.  He has the power to direct that.

15  He does not have to get permission from investors.  He does not

16  have to get permission from a board of directors.  He can

17  simply direct that it happen.

18       And at this point, as far as the Commission knows,

19  88 percent of the assets of these funds have been sold.  Now,

20  that's based on a telephone conversation that I had with

21  in-house counsel at Morgan Stanley, who informed us that they

22  have liquidated 100 percent of the assets that were in the

23  fund -- or I am sorry -- in the brokerage account located at

24  Morgan Stanley.  Mr. Price testified in his deposition that

25  roughly 88 percent of the fund assets were there.

```
 1        Under those circumstances, with only 12 percent of assets

 2   potentially remaining and whatever moneys Mr. Price may have

 3   placed in various places, we are just not convinced it is in

 4   the best interest of these investors to continue receiving

 5   distributions until a receiver can get his arms around what

 6   remains, who has been advantaged, who has been disadvantaged,

 7   and who really is entitled to receive the balance of payments

 8   on this.

 9        THE COURT:  But that's not the standard, is it?  It

10   is a standard where the Court has to find there are

11   extraordinary circumstances that would justify the appointment

12   of a receiver, not that it is the opinion of the government it

13   might be in the best interest of these investors to have a

14   receiver come in.  So that's where I think I have a disconnect.

15        But let me ask you about something you just said.  You

16   stated that Mr. Price has the power to direct the sale of

17   assets.  And to the extent that the preliminary injunction

18   prevented Mr. Price from directing the sale of assets without

19   the approval of the SEC, why then would we need a receivership?

20        MS. DEAN:  Again, Your Honor, it just goes back to

21   what I was saying before, Mr. Price is not a trustworthy

22   custodian of these funds.

23        THE COURT:  Do you have any evidence he's violated

24   any order of this Court?

25        MS. DEAN:  To my knowledge -- no.  The Court has not
```

1    issued any orders to date.

2         THE COURT:  Or has violated any directive that was

3    made by the SEC or some other administration?  I know you

4    pointed to what you view as fraudulent conduct, so he's

5    violated the law in that respect.  But at this point, because

6    the receivership is such an extraordinary remedy, the question

7    is what indication is there that Mr. Price is not prepared to

8    obey an order of the Court, keeping in mind that if he fails to

9    obey an order of the Court, he is subject to any number of

10   consequences and penalties, including prosecution?

11        MS. DEAN:  Well, the Commission has not actually

12   issued any directives to Mr. Price with respect to the

13   management of the business because that is not what the

14   Commission does; however, I can tell you the Commission has

15   subpoenaed documents in the course of its investigation that it

16   has still not received, so he is apparently not interested in

17   complying with lawfully issued subpoenas.

18        THE COURT:  When were the subpoenas issued?

19        MS. DEAN:  The first subpoena to ABS Manager was

20   issued in July, and I believe there was a follow-up subpoena in

21   December or -- late November, Your Honor.  And there is

22   evidence of that.  There is a discussion about those subpoenas

23   in the first declaration that was submitted by myself on behalf

24   of the Commission.  The subpoenas themselves are exhibits, and

25   there are some attachments, which are e-mails, communications

1    back and forth between Mr. Price's counsel and Commission

2    counsel with respect to compliance with the subpoenas.

3        Just to sort of close out my response to the points that

4    Mr. Chester made, this question of nonaffiliated entities,

5    although we are mindful of the fact that Mr. Price has made

6    investments in the fund and has made investments through

7    various entities affiliated with him, there are other people

8    apparently invested in the fund, including Mr. Price's brother,

9    who we would argue is an affiliate of Mr. Price, and there may

10   be other people that have relationships with Mr. Price that are

11   currently unknown to the Commission.

12       So we are -- we appreciate the offer not to make payments

13   to nonaffiliated entities, but we are currently not in a

14   position to know exactly what Mr. Price means by that offer, or

15   whether the entities that were just described by Mr. Chester

16   encompassed the universe of affiliated entities that should not

17   receive payments.

18       And in addition, I just want to point out, Mr. Chester

19   says he thinks it is appalling that the SEC does not know where

20   all the assets are.  But frankly, the SEC frequently finds

21   itself in this position when it's dealing with someone that is

22   accused of fraud.  The person who has the most knowledge about

23   what moneys came in, what moneys went out, and where those

24   moneys were directed is always going to be the defendant.  It

25   really just sort of -- it bespeaks the need for a receiver,

1    that the Commission cannot know what assets currently exist

2    without having a neutral third-party on hand to marshal those

3    assets.

4              THE COURT:  Under that theory, wouldn't have you have

5    in any case alleging fraud then an automatic right to a

6    receiver?  Because in every case alleging fraud, you are going

7    to have a defendant who has control of the records, the

8    information that is the subject of the investigation, and

9    because necessarily they have that control, the best way to get

10   to it, in the view of the government, is going to be, "Well,

11   let me have my receiver go in and have access to everything"?

12             MS. DEAN:  Not necessarily.  I believe it is a facts

13   and circumstances determination.

14        But the authorities that we provided in our briefs on this

15   matter, the *Credit First* case, the *Fifth Avenue Coach Lines*

16   case, *Wencke*, all recognize the need for the appointment of a

17   receiver where there is a lack of clarity about the financial

18   affairs of the potential defendants, a need to preserve assets,

19   a need to pursue claims and make distributions to investors,

20   and all of those things are present here.

21             THE COURT:  And I guess the question is to what

22   extent, if any.  All right.

23        I will allow one final reply from the defense, and then

24   that will conclude the argument portion.

25             MR. CHESTER:  Thank you, Your Honor.  My preceding

1    discussion was solely based on your question.  I would like to

2    take you through, though, a few areas that I think will cover

3    some of the allegations made.

4             THE COURT:  All right.  And at some point, if you can

5    identify for us who would be the affiliated investors that

6    would not be included within the carve-out exception.

7             MR. CHESTER:  Certainly, I will do that, Your Honor,

8    if I may take a moment.

9             THE COURT:  Yes.

10            MS. DEAN:  Your Honor, while counsel is doing that,

11   if you wouldn't mind, I wanted to refer you to the exhibits

12   that I just referenced in my prior statement.  My declaration,

13   which was filed with the Court on February 26th, it's document

14   20-30.  It's a supplemental declaration of Lynn M. Dean.  And

15   the exhibits with respect to subpoena compliance are Exhibit 3

16   through 5, Your Honor.

17            THE COURT:  Thank you.

18            MR. CHESTER:  Thank you, Your Honor.  I think you

19   picked up on the burden that the SEC has to establish both a

20   receivership and also to freeze personal assets.  It's a pretty

21   heightened threshold due to the seriousness of that

22   extraordinary relief.  And so far, really all we have heard

23   from the SEC are conclusory allegations here today and in the

24   pleadings.  For example, I think we heard a number of times

25   that the SEC is not confident that leaving him in charge is

 1   good.  And what you have heard is conclusory statements

 2   following that same that we needed to marshal assets, we needed

 3   to clean the affairs of the company.  And counsel correctly

 4   enumerated the items that courts look for.  The problem is --

 5   and I think the record reflects -- there is no evidence that

 6   proves those elements.

 7       For example, Your Honor, I believe I handed out a book of

 8   demonstrative evidence, rather than go to a laptop and a

 9   projector and try to go through it.  If we turn to what is

10   behind tab Number 5 -- and this is basically outlining in two

11   parts why there is no evidence supporting a personal asset

12   freeze on defendant Price, and below that, why there is no

13   evidence supporting a receiver.

14       As far as the personal asset freeze, Your Honor, there is

15   no evidence of mingling of accounts or assets.  There is not a

16   single example in the ten pounds of paper that have been filed

17   in this Court indicating that there's been any type of

18   commingling or mixture of assets or accounts.

19       The second is directly out of the *Johnson v. Couturier*

20   case, which is a Ninth Circuit case cited by the parties, which

21   is there is no evidence of a likelihood of dissipation of

22   assets.  The mere possibility is not enough.  And that's taken

23   right from the Court.

24       What you have heard today is the SEC is not confident,

25   because there's a possibility that Mr. Price will do this and

1    do that, but there's no showing of a likelihood.

2         Also, as far as the dissipation of assets, Your Honor, the

3    only charge in this case against Mr. Price is that, pursuant to

4    the PPM and the investor agreements, his company, ABS Manager,

5    was paid compensation based on the contract.  The SEC now

6    claims that they interpret the contract differently, and that

7    based on the value of bonds, percentage of returns, they were

8    not entitled or they didn't earn that compensation.

9         That's not dissipation of assets.  That's simply saying,

10   "The way I read your agreement, you really shouldn't have

11   gotten paid that much.  Now, we are not disputing how much you

12   got paid, but we don't think you should have got paid."  We

13   disagree with that, and that's going to be something later on

14   either for summary judgment or trial, but it doesn't show a

15   likelihood of dissipation of assets.  There is no other claims

16   that money was wrongfully -- or assets were dissipated.

17        The next one, no showing that defendant Price fraudulently

18   transferring his assets.  There's no evidence there.  Likewise,

19   he hasn't attempted to hide or spend exorbitantly.

20        THE COURT:  Let me ask something, because something

21   government counsel said is of concern to me; that is, that

22   there have been a number of subpoenas that were issued which I

23   expect is seeking to obtain information that may relate to one

24   or more of these points that you are addressing.

25        Is that correct, that there have been a number of

1   subpoenas that were issued and have not been responded to as

2   required?

3          MR. CHESTER:  No, Your Honor.  I am glad to give you

4   the history in detail.  Part of it is on the record through

5   e-mails.

6      Succinctly stated, in July of 2012, a subpoena was served.

7   In August of 2012, a voluminous response to that subpoena was

8   sent to the SEC as put in the pleading.  September, nothing.

9   October, nothing.  November, nothing.  So we have basically

10  over 90 days of not a word from the SEC.

11     In December, three and a half months later, a new lawyer,

12  Mr. Morgan Ward Doran is on the case, and there are e-mails

13  that he submitted in connection with his declaration,

14  indicating that he was conversing with me.

15     The first thing he did was send a letter saying, "I

16  believe there are deficiencies."  We responded by supplementing

17  the response.

18     And in many cases, we said, "We don't have it.  We don't

19  it.  But here is this.  Here is this."

20     There was one argument we had -- friendly argument -- and

21  that was the SEC wanted each and every e-mail that the fund

22  had.  The explanation was the fund keeps it on the -- I believe

23  it's hotmail.com server.  So we can't just push a button and

24  get all the e-mails.  It's going to take us time.

25     But we also questioned, why do you need thousands of

1   e-mails?  You are getting e-mails from the accounting firm and

2   from third parties.  They even contacted investors and got

3   e-mails.

4       So we went back and forth, but there was never any formal

5   meet and confer or motion filed.

6           THE COURT:  So it's limited to the question of

7   e-mails?

8           MR. CHESTER:  Yes, Your Honor.  And that's in the

9   pleadings.

10          THE COURT:  Thank you.

11          MR. CHESTER:  And please, put that on my shoulders,

12  no on the client's.

13      Next -- and this one is also from the *Johnson v. Couturier*

14  case -- no showing that the SEC will be unable to recover in

15  the absence of an asset freeze.

16      And Your Honor, as you can tell from the thickness of the

17  deposition transcript of Mr. Price, he was deposed for seven

18  hours on the record, and there was not a single question or

19  inference that the SEC would be unable to recover in the

20  absence of an asset freeze.  They didn't even go into that

21  area, and up until today, you have received no evidence

22  supporting that.

23      That and the likelihood of dissipation are the two main

24  prongs, I will call it, of the *Johnson v. Couturier* case.

25      The last one, the asset freeze will strip defendants of

1  the ability -- you can read the rest of that.  If we go down to

2  the receivership, we know that there is a crossover between the

3  two elements, but again, no suggestion that Mr. Price has

4  stolen funds or acted with any illicit intent.

5      As far as moving forward, the SEC has a full plethora of

6  civil discovery.  They can investigate this case.  You don't

7  need to bring in a receiver who is going to hire a law firm,

8  and they are going to start from scratch, when the SEC is doing

9  it for free.  The SEC is protecting these investors, in their

10  minds, by going after Mr. Price and the fund and trying to

11  uncover all sorts of problems.  You don't need a receiver and

12  an independent law firm to do that.  They are doing the job for

13  the investors.

14          THE COURT:  And let me ask you the question that I

15  posed earlier to the government, as far as Spicer Jeffries,

16  LLP, who was hired to audit operations, did they conclude their

17  audit?

18          MR. CHESTER:  No, Your Honor.  The testimony

19  Mr. Price gave was they are a very expensive company from

20  New York, doing a lot of a public company audits.  And they are

21  doing a year-end December 31, 2012 audit.  It's now March.  I

22  think that is apropos in the business; it does sake several

23  months for these reports to come out.

24          THE COURT:  Then another question, with respect to

25  what is left of the funds, evidently somewhere around

1    80 percent has been liquidated by Morgan Stanley Smith Barney.

2    As to what remains, is there any indication of what the value

3    of the funds are?

4             MR. CHESTER:  Your Honor, if you are asking me to go

5    outside the record, I would be glad to with your permission.

6         Right now, the record before this Court on the Morgan

7    Stanley liquidation and the assets in the account is paper

8    thin.  All you have is hearsay.  You have a phone conference

9    between counsel and a Morgan Stanley lawyer briefly stated in

10   the SEC lawyer's declaration, "I spoke to counsel for Morgan

11   Stanley, who said the account was liquidated and there's an

12   $18,000 deficit."  That's it.  That's all you have before you

13   in the record.

14        What we could tell you is -- and now I am not going to go

15   outside the record, but you can infer from this.  In that

16   conversation, neither the SEC nor Morgan Stanley counsel

17   discussed what about the accrued interest that's going to be

18   paid to the account even after the bonds are sold?  What if

19   there's going to be several hundred thousand dollars going to

20   be put into that account for distribution to investors?

21        As the Court may know, when a security has a dividend or

22   interest payment due to it, they have what's called a record

23   date.  And if you sell the security after the record date, the

24   original holder of the security is still going to get the

25   interest payments.  And we believe that's the situation here.

```
 1   So that account, we believe, will have substantial cash in it

 2   in the near future for distribution to investors.

 3               THE COURT:  All right.

 4               MR. CHESTER:  And then the second account, which was

 5   unaffected by Morgan Stanley, that was with Capital Securities,

 6   still has moneys that are accruing from bonds owned by the

 7   fund.

 8               THE COURT:  Any indication in the record how much is

 9   accruing on a monthly basis?

10               MR. CHESTER:  There is nothing in the record.  Again,

11   I can go outside of the record if the Court would like me to.

12               THE COURT:  And it would be based upon what

13   information?

14               MR. CHESTER:  Information that Mr. Price is able to

15   see by looking at the accounts on line and then reporting to

16   counsel.

17               THE COURT:  And what does that information reveal?

18               MR. CHESTER:  My understanding, it's somewhere

19   between 1.1 million -- approximately 1.1 million in securities

20   that are generating interest, which is then distributed to

21   investors.

22               THE COURT:  Anything else?

23               MR. CHESTER:  Yes, Your Honor.  If you turn behind

24   tab 4 -- because I know we have been talking about the proposed

25   order in piecemeal.  As we said in our pleadings, this really
```

 1   goes beyond the scope of what the SEC requested.  And it's
 2   really in good faith, I think, that the defendants are willing
 3   to put handcuffs on and restrain themselves without pushing the
 4   SEC.  Obviously, no new investments from investors.  And Your
 5   Honor, three-quarters or 80 percent of the pleadings you have
 6   received from the plaintiff are all complaints about what went
 7   on during the purchase and sale, and that is really an issue
 8   for longer-term determination.  So obviously, there would be no
 9   new investments from investors.
10       We also have no purchase or sales of the fund assets.
11   That's the CMOs.  I think the SEC earlier said they are not
12   confident that he wouldn't just start selling assets away.  I
13   don't know where they are basing that from, but part of the
14   freeze would be no purchase or sale of fund assets, and the
15   caveat would be without prior notice to the SEC.  And we
16   believe five days, five business days -- which is essentially a
17   week -- is enough notice.  But if they need more, we would
18   certainly agree to it.
19           THE COURT:  Other than the CMOs, are there any other
20   assets that would be subject to being sold by Mr. Price?
21           MR. CHESTER:  No, Your Honor.  The only other assets
22   would be the cash balance in the accounts which accumulate each
23   month from the interest payments on the CMOs.
24       And then the concerns -- they weren't raised here today
25   but they are in the pleadings -- preservation of documents,

 1  which is really superfluous here because everything has been

 2  produced, with the exception of the e-mails, and those are not

 3  on a company server.

 4      The render accountings, if the Court wants to give a

 5  deadline for a report, that's fine.  We are hoping Spicer

 6  Jeffries, with the audited financials, can produce those pretty

 7  quickly.

 8      It should be noted, however, Your Honor, a lot of small

 9  companies like this do not pay for audited financials.  They

10  are fine with their accountant.

11      And I will have you turn to tab one in a second.  You will

12  see there's an outside accounting firm that does all the tax

13  reporting for ABS funds, does all the tax reporting for

14  ABS Manager, and sends K-1s to all the investors.  So that firm

15  has already produced to the SEC by subpoena -- it's called

16  Majestic Financial -- all the financials of the firm, and they

17  are not audited.  As Court knows to get it audited, you spend a

18  lot more money with a larger accounting firm.

19      The last point is the limitation on distributions from

20  CMOs.  As previously explained, those will all be calculated by

21  third parties with five days or more notice to the SEC.

22          THE COURT:  And then we have the issue of affiliated

23  investors.

24          MR. CHESTER:  Yes, Your Honor.

25          THE COURT:  Are you in a position to identify who the

1   affiliated investors would be?

2           MR. CHESTER:  Yes, Your Honor.  There's -- there are

3   accounts at Morgan -- I am sorry -- with ABS, with securities

4   that were held in Morgan Stanley owned by Mr. Cody Price,

5   individually; ABS Manager, LLC, which is a sole-member LLC that

6   Mr. Price is the sole member of; ABS Manager 401(k); and Cavan,

7   C-A-V-A-N, Cavan Private Equity Holdings, which is also an

8   entity of which Mr. Price is the sole member.

9           THE COURT:  Is one of these an entity that is owned

10  or partially owned by Mr. Price's wife?

11          MR. CHESTER:  No, Your Honor.  Only through our

12  community property laws would she be able to claim an interest,

13  but she is not named on the corporate documents.

14          THE COURT:  And as far as individuals that are

15  related to Mr. Price, was it his brother, or do you know of any

16  such individuals?

17          MR. CHESTER:  Yes, Your Honor.  And the SEC has been

18  provided with each investor file, which they have tracked when

19  the investor signed up, how the investor put money into the

20  fund.  There is no evidence or allegations at all that

21  Mr. Derek Price didn't put in, I believe, $200,000 early on in

22  the process, and he's been receiving payments since then.

23  There is no evidence that he got that for free or didn't pay

24  valid consideration.  So we would ask that he not be part of

25  the "affiliated," but if the Court so chooses, we understand.

 1          THE COURT:  And let me ask, do you have any

 2    estimate -- and if you don't, that's fine -- do you have any

 3    estimate of how much it would cost to bring in a receiver on a

 4    monthly basis?  Do you have any way of knowing?  As I stated, I

 5    appreciate you may not have any information on that.

 6          MR. CHESTER:  Your Honor, I have delegated that -- or

 7    I should say co-counsel is handling that aspect.  If you would

 8    like to hear from Mr. Pestotnik, he can inform the Court.

 9          THE COURT:  I am going to do something, which is

10    allow the government to respond, because they do have the

11    burden of proof, and there were a couple of things that came up

12    during the course of your argument, that I believe it's

13    appropriate to have the government respond.  But I would like

14    the government to address the question, do they have an

15    estimate of how much it would cost for a receiver to be brought

16    in on a monthly basis.  Then I will also ask the government if

17    they have any information on what the value is of the remaining

18    assets that have not yet been sold.  Thank you.

19          MR. CHESTER:  Thank you, Judge.

20          MS. DEAN:  Thank you, Your Honor.

21       Just to address -- to start with Your Honor's question

22    first, the receiver in this case has discounted -- the proposed

23    receiver has discounted his regular fees down to $295 an hour.

24    So to the extent he's appointed, that is a substantial discount

25    over what he normally charges.

1    But to the extent that cost is an issue, we would like to

2    propose to the Court that an alternative to receiver would be

3    simply to appoint a monitor.

4    The defendants have already offered to allow the SEC five

5    days' notice before they make any expenditures or sell any

6    securities or make any distributions.  Rather than making those

7    representations to the SEC, we would propose that the Court

8    appoint a monitor, who would address the primary shortcomings

9    that we see, which is just leaving defendants in control

10   without anyone overseeing their management of the funds.

11   There is some authority for this.  *FTC v Millennium*

12   *Telecard*.  The citation I have is 2011, Westlaw, 2745963, at

13   star 13-14.  In that case, the Court found that it had actually

14   appointed a temporary receiver and then decided to transition

15   that person into the role of a monitor.

16   A monitor here would perform many of the functions that

17   the Commission is concerned about.  It would allow defendants

18   to retain day-to-day responsibilities, but it would have the

19   power to review corporate records and financial transactions of

20   the ABS Manager and the funds on a periodic basis, either

21   weekly or biweekly as the Court sees fit.  It could inspect

22   books and records.  And it would be in a position to ensure no

23   distributions are made which should not be made.

24   So, you know, although the SEC is still convinced a

25   receiver really is the best course of action here, to the

1    extent that the Court is not satisfied that we have met our

2    burden, we respectfully submit that a monitor would address

3    many of the concerns that we have expressed.

4        I just wanted to point out a couple of things about

5    Mr. Chester's argument, just to address a couple of statements

6    he made.  He indicated that the e-mails that Mr. Price has are

7    not on Mr. Price's server; they are hotmail e-mail, and

8    therefore destruction of them is not an issue.  Mr. Price still

9    has the capacity to destroy those e-mails if he wants to.  And

10   the defendants have previously stipulated they would be willing

11   to accept an order requiring them to preserve documents, and

12   they have a document preservation obligation attendant to the

13   fact they are currently parties to a lawsuit.  So we would

14   submit it is not much of a burden to actually order them not to

15   destroy documents.

16       As to the defendant's brother, Mr. Derek Price, I don't

17   think the Commission intended to suggest -- I certainly did not

18   intend to suggest we have any evidence he did not actually

19   invest in ABS Manager.  My point was simply he is directly

20   affiliated with defendant, and if defendant were to decide that

21   he wanted to transfer away assets, one way to do it would be to

22   make distributions to a relative.  And that is why we would ask

23   that he be included in the affiliated entities definition.

24       We note that defendants have had multiple opportunities to

25   put before the Court information about the value of the assets

 1   that remain, and the Court obviously has concerns about the

 2   value of those assets as does the Commission.  Defendants have

 3   been unwilling to share with us what information they have.  It

 4   was -- and they appeared to be reluctant to disclose that

 5   information to the Court today.

 6       We know that there is some income stream that remains from

 7   the securities that Morgan Stanley sold.  We do not know how

 8   much money that is.  We know that there are funds -- or I am

 9   sorry -- there are securities held for the benefit of

10   ABS Arizona.  We just heard Mr. Chester say that they are

11   valued at approximately $1.1 million.  That's -- that's as good

12   as any information we have had to date.

13           THE COURT:  Let me ask, wouldn't an accounting be

14   able to identify what the values are?

15           MS. DEAN:  Well, an accounting, yeah.  I mean -- an

16   accounting by the defendants, or an audited financial by Spicer

17   Jeffries?

18           THE COURT:  Well, part of what I understand is

19   consented to is an accounting; is that correct?

20           MS. DEAN:  Yes.  Yes.  We would like the defendant to

21   provide -- defendants to provide under penalty of perjury an

22   accounting of all of the assets that currently remain.

23       Under the circumstances, considering that fully 88 percent

24   of the fund's assets have apparently been dissipated at this

25   point, we don't think it's particularly burdensome, and we

 1 | certainly think it's necessary.

 2 |         THE COURT:  To the extent that we know what

 3 | 88 percent makes up, what is that 88 percent?

 4 |         MS. DEAN:  Mr. Price testified at his deposition that

 5 | 88 percent -- this was his estimate -- of the value of the

 6 | assets held by the funds were currently, at that time, in early

 7 | March, in the custody of Morgan Stanley.  Morgan Stanley has

 8 | since liquidated those securities.  My understanding is they

 9 | got slightly more than $10 million for them.

10 |         THE COURT:  At what's been termed a fire sale rate?

11 |         MS. DEAN:  And frankly, Your Honor, we have no

12 | insight as to how Morgan Stanley went about selling those

13 | assets.  Mr. Price has submitted a declaration saying he

14 | believes it was a fire sale.

15 |     I am just -- at the point of time -- at the point that

16 | Morgan Stanley sold them, they were attempting to satisfy the

17 | line of credit that was outstanding, and at that point, it was

18 | to my knowledge just over $10 million.

19 |         THE COURT:  All right.

20 |         MS. DEAN:  Just one last thing, Your Honor, just to

21 | wrap up, just to make it clear, the Commission here has not

22 | alleged anything close to a dispute about valuation, which is

23 | what defendants keep harping on.  The truth is that in the PPM

24 | for Capital Access Fund, which is Exhibit 3 the Doran

25 | declaration, page 14, defendants represented that the

1   historical rates of return for the ABS Fund Arizona and the

2   ABS Fund California had been, with respect to the Arizona fund,

3   18 percent, and with respect to the California fund, 12 and a

4   half percent.  Nowhere in that disclosure is there any

5   indication that their calculation of the rate of return did not

6   include the diminishing value of the underlying securities.

7       And I had the following exchange with Mr. Price at his

8   deposition, and this is found at page 228, lines 12 through 23.

9   I asked Mr. Price:  "So using your definition of return, as set

10  forth in the PPMs for the three funds managed by ABS Manager,

11  under that scenario, if the investment declined by 50 percent

12  would ABS Manager still be entitled to collect its management

13  fees?"

14      His answer:  "So long as the interest payments that we

15  made obligations to make were made, ABS Manager would be

16  entitled to compensation."

17      My question:  "That would be irrespective of what the

18  actual underlying asset value was, correct?"

19      His response:  "Correct, but we have no way of knowing the

20  asset value."

21      Mr. Price offered investors an investment in what he

22  described as safe, secure, government-backed,

23  United-States-Treasury-backed agency bonds that he represented

24  to investors were suitable for their retirement funds.  He

25  touted the safety and security of these funds.  And then

```
 1   proceeded to tell me in his deposition there was absolutely no
 2   way to value these funds; that the only way to know the true
 3   value was to know their value on the date that you sold them,
 4   and that his definition of the calculation of the rate of
 5   return did not include any allowance for the underlying
 6   performance of the securities.
 7        And the fact is, as set forth in the declaration of Carol
 8   Shau, which was submitted with the Commission's motion for
 9   preliminary injunction, the actual asset values, as of the last
10   date that Ms. Shau had been able to ascertain based on a review
11   of the company's brokerage statement, was that they had lost
12   26 percent of their value for an overall rate of return not 12
13   and a half percent, not of 18 percent, but negative two
14   percent.
15        That is a fraud.  That is what the Commission has alleged
16   here.  That is what defendants have done.  And under the
17   circumstances, the investors here are out of pocket at least
18   $10 million.
19        So the Commission is very concerned that leaving Mr. Price
20   in control of these entities is not in the best interest of
21   investors.  And frankly, we believe that we have satisfied the
22   standard to show there is real possibility that further
23   dissipation of investor assets could take place if he is left
24   in control.  Thank you.
25             THE COURT:  Thank you.
```

1        I am going to take the matter under submission, but I

2   expect I will issue an order probably by tomorrow.  All right.

3            MR. PESTOTNIK:  Thank you, Your Honor.

4            MS. DEAN:  Thank you, Your Honor.

5            MR. PUATHASNANON:  Thank you, Your Honor.

6        (End of proceedings at 2:32 p.m.)

7                        -o0o-

8               C-E-R-T-I-F-I-C-A-T-I-O-N

9

10           I hereby certify that I am a duly appointed,

11   qualified and acting official Court Reporter for the United

12   States District Court; that the foregoing is a true and correct

13   transcript of the proceedings had in the aforementioned cause;

14   that said transcript is a true and correct transcription of my

15   stenographic notes; and that the format used herein complies

16   with rules and requirements of the United States Judicial

17   Conference.

18           DATED:  December 18, 2013, at San Diego,

19   California.

20

21                        /s/  Chari L. Possell

22                        _____
                          Chari L. Possell
23                        CSR No. 9944, RPR, CRR

24

25