1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10   SECURITIES AND EXCHANGE          CASE NO. 13cv319-GPC(BGS)
     COMMISSION,
11
                                Plaintiff,
12                                              **ORDER DENYING PLAINTIFF'S
                                                MOTION FOR SUMMARY**
13        vs.                                   **JUDGMENT; GRANTING
                                                DEFENDANTS' MOTION FOR**
14                                              **PARTIAL SUMMARY
                                                JUDGMENT; AND GRANTING**
15                                              **DEFENDANTS' MOTION TO SET**
     ABS MANAGER, LLC and GEORGE                **ASIDE DEFAULT**
16   CHARLES CODY PRICE,
17                              Defendants,
                                                [Dkt. Nos. 61, 64, 66, 72.]
18   ABS FUND, LLC [ARIZONA]; ABS
     FUND, LLC [CALIFORNIA];
19   CAPITAL ACCESS, LLC; CAVAN
     PRIVATE EQUITY HOLDINGS,
20   LLC; and LUCKY STAR EVENTS,
     LLC,
21
                        Relief Defendants.
22

23        Before the Court are Plaintiff Securities and Exchange Commission's motion for

24   summary judgment; and Defendants ABS Manager, LLC and George Charles Cody

25   Price's motion for summary judgment and motion to set aside default.  (Dkt. Nos. 61,

26   64, 66.)  Oppositions and replies were filed.  (Dkt. Nos. 70, 71, 73, 74, 75, 77.)  After

27   a review of the briefs, supporting documents, and the applicable law, the Court

28   DENIES Plaintiff's motion for summary judgment; GRANTS Defendants' motion for

partial summary judgment; and GRANTS Defendants' motion to set aside default.

## Background

On February 8, 2013, Plaintiff Securities and Exchange Commission ("SEC") filed a complaint along with an *ex parte* application, without notice, for a temporary restraining order ("TRO") and order freezing assets; appointing a receiver over defendant ABS Manager, LLC and the entities it controls and manages; prohibiting the destruction of documents; granting expedited discovery; and requiring an accounting. (Dkt. Nos. 1, 2.) The SEC also filed an *ex parte* application, without notice, for an order temporarily sealing the entire file until the asset freeze is served. (Dkt. No. 2.) On February 11, 2013, the Court denied Plaintiff's *ex parte* application for TRO and denied Plaintiffs' *ex parte* application to temporarily file entire case under seal. (Dkt. No. 3.) On February 19, 2013, Plaintiff filed a motion for preliminary injunction along with an *ex parte* motion to shorten time for hearing on the motion for preliminary injunction. (Dkt. No. 5.) After briefing by both parties, on February 27, 2013, the Court granted Plaintiffs' *ex parte* motion and set the matter for hearing on March 15, 2013, which was continued to March 19, 2013 after granting the parties' joint motion to continue the hearing date. (Dkt. Nos. 22. 24, 30.) On March 20, 2013, the Court granted Plaintiff's motion for preliminary injunction and for an order partially freezing assets of ABS Manager and the Funds, preserving documents, and requiring an accounting and denying Plaintiff's motion for an order freezing all funds' asset and personal assets and order appointing a receiver. (Dkt. No. 31.) A preliminary injunction order was filed on April 4, 2013. (Dkt. No. 35.)

The complaint alleges violations of sections 206(1) and 206(2) of the Investment Advisers Act of 1940; violations of section 206(4) of the Investment Advisers Act of 1940 and Rule 206(4)-8; violations of section 17(a) of the Securities Act of 1933 ("Securities Act"); violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5; and violations of section 20(a) of the Securities Exchange Act of 1934. (Dkt. No. 1.)

[13-319-GPC(BGS)]

Plaintiff moves for summary judgment as to all causes of action in the complaint. Defendants move for summary judgment as to the first two causes of action based on violations of the Investment Advisers Act of 1940 as they contend they fall under an exception to the definition of investment adviser. Defendants also move to set aside default entered against Relief Defendants Cavan Private Equity Holdings, LLC and Lucky Star Events, LLC. (Dkt. No. 59.)

### Factual Background

ABS Manager, LLC was formed by George Charles Cody Price ("Price") in March 2009. Price is ABS Manager's sole member, and serves as its President and Chief Executive Officer. From 2009 to the present, 35 individuals invested about $20 million to three Funds, ABS Fund, LLC (Arizona) ("ABS Fund Arizona"), ABS Fund, LLC (California) ("ABS Fund California") and Capital Access, LLC Fund (collectively known as the "Funds") managed by Defendants. Investors received membership units or interests in the Funds in which they invested and a brokerage held the securities.

The ABS Fund Arizona was first offered in March 2009 and sold units to about 13 or 14 investors for around $2.4 million. (Dkt. No. 64-3, Dean Decl., Ex. 1 at 1.) ABS Fund Arizona's Private Placement Memorandum ("PPM") stated that investors were entitled to a rate of 18% on their unreturned capital contribution. (Id. at 6.)

The ABS Fund California, also known as the Nationwide Platinum Fund, was first offered in June 2010 and sold units to 35 investors for about $14.1 million. (Dkt. No. 64-3, Dean Decl., Ex. 2 at 1-2.) The ABS Fund California's PPM stated that investors were entitled to a 12.5% variable return with a minimum of 7.48% on their unreturned capital contribution. (Id.)

The Capital Access Fund was first offered in August 2012 and sold units to 35 investors for about $18.8 million. (Dkt. No. 64-3, Dean Decl., Ex. 3 at 1.) This Fund provided that investors were entitled to a 12.5% variable return with a minimum of 7.48% on their unreturned capital contribution. (Id. at 8-9.)

The Funds used investor funds to obtain U.S. government issued agency interest

only ("IO") collaterized mortgage obligations ("CMO") and reverse IO CMOs which were purchased through brokerage accounts maintained by the Funds with licensed broker dealers, such as Morgan Stanley Smith Barney ("Morgan Stanley"). The investors receive monthly interest payments that accumulate in the accounts. These calculations are conducted by a third-party accounting professionals. The Fund, through ABS Manager, distributed the accumulated monthly interest to the investors according to the accountant's spreadsheets. The accounting firms send monthly account statements to each investors, which reflect distributions and the investor's monthly membership interest account statements. The third party accounting firms also calculate the compensation that ABS manager is to receive after distributions are made to the Fund's investors. SEC disputes theses facts to the extent that the accounting firms did not base calculations or did not take into consideration the net asset value of the Funds.

Mortgage-backed securities ('MBS") are bonds whose payments are secured by the principal and interest payments made by borrowers in a collection, or pool, of mortgages. (Dkt. No. 64-28, Weiner Expert Report at 6.) Mortgage backed securities can be either "Agency" or "Non-Agency." (Id. at 9.) A government-backed instrument is known as Agency.

> An Agency carries the names of one of the mortgage Government Sponsored Entities ("GSE"): Fannie Mae, Freddie Mac or Ginnie Mae. In return for a fee taken as a slice of interest from the mortgage payments in the pool, the GSEs guarantee the timely payment of principal and interest of each of the mortgages in the pool. (Id.) This 'Agency' guarantee effectively removes default risk from the investment because if a mortgagor defaults, the Agency purchases the loan from the pool at full face value, along with any interest accrued and owed, and that repurchase is passed along to investors in the pool.

(Id.)

Ginnie Mae is not a government agency, but is a 'wholly-owned government corporation located within the U.S. Department of Housing and Urban Development (HUD)'" (Id. at 10.) Fannie Mae and Freddie Mac are "government-chartered, but publicly-owned, corporations, with common and preferred stock that trade on public

stock exchanges." (Id.) This Agency "guarantee" applies to timely payment of interest and principal but not on a decline in the market value of any security or a guarantee that an investor will necessarily earn a positive return on the holding of a security. (Id.)

An Agency Collateralized Mortgage Obligation ("Agency CMO") was created from MBS and "redirects the principal and interest cash flows from a pool of similar mortgage pass-throughs into a different and newly-created set of bond classes or 'tranches.'" (Id. at 12.) CMO tranches can be tailored to meet a particular investment need or investor class. (Id.) While there is an Agency guarantee as to the required payments to investors, it does not guarantee a liquid market or a positive return on an investment, especially one that is sold prior to its maturity date. (Id. at 13.) A type of Agency CMO is an interest only ("IO") where investors receive only the interest payments. (Id.) Because it receives no principal, it has no underlying principal balance but instead has a "notional" balance which tracks the balance of the underlying bond from which it was structured. (Id. at 14.) Since there is no principal payment, the investor does not receive a final return of principal as a single payment on the final maturity date or as a stream distributed throughout the life of the investment. (Id.) The investor is only entitled to interest flows during the time the security is outstanding. (Id.) Should mortgage refinancings increase, then the flow is reduced and ultimately extinguished. (Id.) Owning an IO security "constitutes a sort of race to recoup the initial investment plus enough additional interest to produce a desired level of return before the security disappears." (Id.)

An Inverse IO is a CMO tranche that pays only interest and with a coupon that resets monthly according to an inverse-type formula. (Id. at 18.) These are the "among the most complex, difficult to understand, value and manage mortgage derivative securities . . . and are considered to be among the riskiest forms of CMO securities."

[13-319-GPC(BGS)]

1   (Id.)[1]

2       According to Plaintiff, the Inverse IOs contain two risks.  First, the risk of a rise

3   in LIBOR reducing the coupon as a result of the coupon formula, and second, the risk

4   of an increase in mortgage prepayments, which will cause the notional balance of the

5   security to pay down and eventually evaporate.  The Agency guarantee provides no

6   protection as to these risks.  According to Price, the "government backing" of Agency

7   IOs and Inverse IOs eliminates IO credit risk and several other risks.  (Dkt. No. 73-2,

8   Price Decl. ¶ 34.)

9       All three of the Funds' PPMs state the Fund would invest in various types of

10  collateralized mortgage obligations ("CMO") but do not mention the specific type.

11  (Dkt. No. 64-3, Dean Decl., Ex. 1 at 1; Ex. 2 at 11; Ex. 3 at 7.)  Ultimately, the ABS

12  Funds were invested in two particular types of Agency CMOs: IO and Inverse IO

13  tranches. (Dkt. No. 68-4, Suppl. Dean Decl., Ex. 37, Price Depo. at 118:20-23; 119:19-

14  120:7; 121:10-18; 122:3-8; 123:34-124:1; 249:5-12.)

15      Agency IO and Inverse IO tranches of CMOs are high risk, volatile securities.

16  (Dkt. No. 64-3, Dean Decl., Ex. 7 at 16-17; see also Dkt. No. 64-28 Weiner Report. at

17  15.)  While the parties dispute the degree of risk, it is clear that these investments were

18  not for the ordinary investor but required a sophisticated investor.  (See Dkt. No. 64-3,

19  Dean Decl., Ex. 1 at 5 (only certain sophisticated accredited investors who are able to

20  bear a substantial loss of their capital contribution may invest); Ex. 2 at 7 (investor

21  required to represent that they are sophisticated in busines and financial matters or have

22  been advised by someone who is); Ex. 3 at 5 ("this offering involved substantial risks

23  . . . investors in the company must have such knowledge and experience in business

24  and financial matters as will enable them to evaluate the merits of the proposed

25

26        [1]Defendants' expert testified that Inverse IOs are not considered to be among the riskiest forms of CMO securities.  (Dkt. No. 73-3, Beirne Depo. at 96:12-15.)  Then,

27  Plaintiff cites to the deposition of Defendants' expert, Beirne, where he states "this is a high-risk fund"; however, Plaintiffs do provide sufficient portions of the transcript

28  for the Court to determine which fund he is talking about. (Dkt. No. 84-3, Dean Decl., Ex. 43, Beirne, Depo. at 112:7.)  There is an implication that the CMO IO securities are high risk.  (Id. at 116:3-15.)

1  investment . . . and be able to bear the economic risks of this investment.")  In their

2  opposition, Defendants concede and state that the investors understood the high risk

3  of investing in these types of securities and that they could lose their total investment

4  and they also understood that the preferred return was not guaranteed nor were there

5  any guarantees regarding the backing for the securities purchased by the fund.  (Dkt.

6  No. 73-3, Price Decl., Ex. F, Flagg Decl.¶ 9; Dkt. No. 73-3, Price Decl., Ex. G, Murch

7  Decl. ¶ 16.)

8      According to Price, Agency CMOs are "fairly sophisticated and not easily

9  understood by the average financial advisor. This is primarily due to the simple fact

10  these securities are traded in a specialized market and are considered 'odd lot'

11  purchases.  Where as most banks look to lend against what are called "round lot"

12  CMOs which are larger in average size than 'odd lot' smaller in size CMOs. While

13  there is always a market in which these securities can be sold, it requires doing a lot of

14  homework and making sure that the bid and ask prices are commensurate with the

15  value of the income generated by the interest-only CMOs in order to obtain a fair price.

16  Not every firm has a person who is an expert in this area, and there are only a few

17  qualified individuals at the films that do have the ability and desire to evaluate and

18  trade these securities." (Dkt. No. 73-2, Price Decl., Ex. A, Price Decl. in Opp. to Pl's

19  Ex Parte Appl. ¶ 11.)

20      From 2010 to 2012, the Funds made interest payments to investors of 12% to

21  18%.  However, the value of certain portfolios held by ABS Arizona and Capital

22  Access had decreased significantly in value.

23                              **Discussion**

24  **A.    Legal Standard for Federal Rule of Civil Procedure 56**

25      Federal Rule of Civil Procedure 56 empowers the Court to enter summary

26  judgment on factually unsupported claims or defenses, and thereby "secure the just,

27  speedy and inexpensive determination of every action. " Celotex Corp. v. Catrett, 477

28  U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

/ / / /

**B.     Anti-Fraud Provisions: Sections 17(a)(1)-(3) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5**

Plaintiff moves for summary judgment on the anti-fraud provisions of the Securities Act and the Exchange Act. The third cause of action alleges violations of sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3). Section 17(a) prohibits fraud in the offer or sale of securities and provides:

> It shall be unlawful for any person in the offer or sale of any securities . . .by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. §§ 77q(a)(1) -(3).

The fourth cause of action is for violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); and Rules 10b–5(a-c), 17 C.F.R. § 240.10b–5. Section 10(b) prohibits fraud in connection with the purchase or sale of any security:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange - - . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 seeks to enforce these statutes by making the following acts in connection with the purchase or sale of any security unlawful:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or

1   of any facility of any national securities exchange,
    (a) To employ any device, scheme, or artifice to defraud,
2   (b) To make any untrue statement of a material fact or to omit to state
    a material fact necessary in order to make the statements made, in the
3   light of the circumstances under which they were made, not
    misleading, or
4   (c) To engage in any act, practice, or course of business which operates
    or would operate as a fraud or deceit upon any person, in connection
5   with the purchase or sale of any security.

6   17 C.F.R. § 240.10b–5.

7        Section 17(a) of the Securities Act, section 10(b) of the Exchange Act, and Rule

8   10b-5 consist of the same elements.  See SEC v. Rauscher, Inc., 254 F.3d 852, 855-56

9   (9th Cir. 2001).  They all "forbid making [1] a material misstatement or omission [2]

10  in connection with the offer or sale of a security [3] by means of interstate commerce."

11  SEC v. Phan, 500 F.3d 895, 907-08 (9th Cir. 2007) (citing Rauscher, 254 F.3d at 855-

12  56).   Section  17(a)(1),  section  10(b)  and  Rule  10b-5  also  require  scienter  while

13  violations of sections 17(a)(2) and (3) require a showing of negligence.  Phan, 500 F.3d

14  at 908.  In a securities fraud action, '[m]ateriality and scienter are both fact-specific

15  issues which should ordinarily be left to the trier of fact,' although 'summary judgment

16  may be granted in appropriate cases.'"  Kaplan v. Rose, 49 F.3d 1363, 1375 (9th Cir.

17  1994) (citation omitted).

18       In  this  case,  the  parties  dispute  whether  Defendants  made  a  material

19  misstatement or omission, and whether Defendants acted with scienter.

20       **1.   Material Misrepresentation or Omission of Fact**

21       The SEC alleges affirmative material misrepresentations and omissions made by

22  Defendants to the Fund investors in the Funds' account statements, newsletters, on the

23  Funds' websites, on the radio and in the PPMs provided to the investors.  The SEC

24  asserts that Defendants misrepresented how the Funds were performing, failed to

25  disclose risks of the Funds, misrepresented Price's experience, and misrepresented

26  assets under management.

27       Defendants argue that the SEC misunderstands the nature of these agency CMOs

28  as they are sophisticated and not easily understood by the average financial advisor.

They also contend that ABS Manager provided written and verbal disclosures regarding the nature of IO and inverse IO investments.  Price further denies he misrepresented his prior work experience.  Lastly, he alleges that the SEC's use of the term "assets under management" is incorrrect.

Violations of the securities antifraud provisions prohibit the making of material misstatements or omissions.  SEC v. Dain Rauscher, Inc., 254 F.3d 852, 856 (9th Cir. 2001); see also Basic, Inc. v. Levinson, 485 U.S. 224, 231–32 (1988); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).  "An omitted fact is material 'if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1092 (9th Cir. 2010) (quoting Phan, 500 F.3d at 908).  In other words, a misrepresentation, misstatement, or omission is material if there is a substantial likelihood that a reasonable investor would consider the true or complete information important in making an investment decision.  See id.  As such, the antifraud provisions of the securities statutes and regulations impose a "'duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'"  SEC v. Fehn, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 504 (9th Cir. 1992)).

Determining materiality in securities fraud cases "should ordinarily be left to the trier of fact."  Phan, 500 F.3d at 908 (citing In re Apple Computer Secs. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989)).  "Materiality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement."  Id.  "The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.  Only if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question

of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment." <u>TSC Indus.</u>, 426 U.S. at 450.

### a.   Defendants Misrepresented and/or Failed to Disclose the Funds' Performance

The SEC alleges Defendants made affirmative misrepresentations and omissions by claiming that since 2010, ABS Arizona earned annual returns of 18% and ABS Fund California and Capital Access earned annual returns of 12.5%; however, these statements as to returns do not take into consideration the value of the underlying securities.  Specifically, the monthly account statements represented that each CMO held in the Funds was individually performing at 18% or better for the ABS Fund Arizona or 12% or better for ABS Fund California and Capital Access Fund.  In addition, in an October 2010 newsletter by email, Price wrote that "[a]ll of the bonds are making well over 18% and will continue to do so for quite some time." (Dkt. No. 63-4, Dean Decl., Ex. 35.)  Further, as of January 2013, the Capital Access website included a "Historic Reference" table showing monthly returns of 1.04% (12.5% annualized) from January 2010 through June 2012. (<u>Id.</u>, Ex. 12 at 10.)  Lastly, in a radio show, Price stated that the Funds have a variable return that "starts in the single digits and goes all the way up into the double digits" and the Funds had seen some extraordinary returns. (<u>Id.</u>, Ex. 6 at 23, 32.)  It is undisputed that these reports did not take into account the value of the assets held by the Funds.  In fact, the underlying value of many of these securities held by the Funds decreased during this time and the SEC alleges that Defendants did not incorporate that fact into their calculation of "returns."   For example, at least three CMOs held by the Funds were stated as performing when, in fact, they had expired and were no longer generating any returns at all.

Defendants allege that the SEC fails to understand the difficulties in valuing the securities at issue and disputes the SEC's method for valuation.  According to Defendants, the SEC's use of the Interactive Data Corporation ("IDC"), a third party

1    aggregator used in the industry to price securities, reports are inaccurate as they only

2    value "round lot" CMOs, not the "odd lot" CMOs at issue, which are bought at a

3    deeper discount than "round lot" CMOs.   Defendants argue that the only way to

4    accurately value these securities is to sell them.   They also contend that there is no rule

5    or regulation that requires Defendants to report the value of the bonds to investors.

6    Underlying these arguments is a dispute on how the "rate of return" is defined.

7    The parties use the term "return" loosely without a precise definition or reference to

8    an expert.   The SEC seeks to define "rate of return" to include not just the interest rate

9    payments but also how the underlying values of the bonds are performing which

10   Defendants admittedly failed to include.[2]   Contrarily, Defendants argue that the "rate

11   of return" on these Agency IO and Inverse IO CMO's has nothing to do with the value

12   of the underlying assets; in fact, Price stated he had no idea about their values.   Price

13   uses interest payments to calculate returns and not the underlying asset values.   (Dkt.

14   No. 68-4, Suppl. Dean Decl., Ex. 37, Price Depo. at 175:13-24; 226:18-25; 228:12-19.)

15   First, the Court concludes that there is a material issue of disputed fact as to

16   whether it is even possible to value the underlying asset without selling the underlying

17   property.   Second, while the parties do not dispute that there is no requirement that the

18   account statements, newsletter comments, the Funds' websites, the radio comments and

19   the PPMs regarding rate of return had to include the underlying value of the assets,

20   there is an issue of material fact in dispute as to whether there is a substantial

21   likelihood that a reasonable investor would have acted differently if the alleged

22   misrepresentation had not been made and the value of the underlying asset been

23   disclosed.   See Phan, 500 F.3d at 908.

24   / / / /

25

---

26   [2]SEC writes in its moving papers, "Although Defendants used the terms 'rate of
27   return,' and 'performing' in communicating with investors regarding the Funds and
     their securities, they were really referring to 'current yield.'" (Dkt. No. 68-1 at 10.)
28   The Court notes that the SEC fails to define each of the terms of art to assist the Court
     in understanding its argument.

1          **b.      Defendants Failed to Disclose the Risks of the Funds**
2                    **Investment**

3          The SEC argues that Defendants failed to disclose the true nature of the

4    investment in the CMOs, particularly that the Funds would invest in the high-risk,

5    volatile Agency IOs and Inverse IO tranches of CMOs.  In response, Defendants argue

6    that the investors were informed, in writing and orally, about the nature of the

7    investment in Agency IO and Inverse IO CMOs.

8          In support, the SEC presents two investors who state they never spoke to Price

9    before investing demonstrating that they did not know the Funds would be investing

10   in IOs and Inverse IO tranches.  (Dkt. No. 64-3, Dean Decl., Ex. 39, Nittoli Depo. at

11   29:22-30:2; Ex. 18, Musumeci email dated 1/28/13.)  According to Michael Nittoli, he

12   did not talk to anyone connected with ABS Fund before investing in the Fund except

13   Glenn Howard.[3]  (Dkt. No. 64-3, Dean Decl., Ex. 39, Nittoli Depo. at at 29:22-30:2.)

14   He explained that he does not recall what Howard told him about the ABS Fund except

15   that it was a good Fund.  (Id. at 30:4-31:14.)   He did not remember or care what the

16   Fund invested in or whether the principal would be protected because Howard was his

17   friend and he relied on Howard's advice.  (Id. at 31:12-18.)

18         SEC also presents an email from an investor named Ronni Musumeci explaining

19   his understanding of his investment in the ABS Manager Funds.  According to his

20   email, which is not sworn under penalty of perjury, Musumeci states that his accountant

21   introduced him to ABS Fund, LLC in January/February 2012.   (Id., Ex. 18.)

22   Subsequently, he spoke with Jay Cowan, who worked for the Fund.  (Id.)  In a

23   telephone conversation, Cowan informed him that ABS Funds primarily invested in

24

25         [3]It is not clear whether Mr. Howard works with ABS Manager or not.  Since the
     SEC provides only portions of the deposition transcript that does not describe who Mr.
26   Howard is and does not explain who Nittoli is talking about, the Court is unable to
     determine whether his conversations with Howard prior to investing in the Funds was
27   sufficient disclosure.  In Dewan's deposition transcript, it appears that Price invested
     in Glenn John Capital LLC, a private equity firm raising capital to make certain
28   investments selected by Glenn Howard.  (Dkt. No. 64-3, Ex. 40, Dewan Depo. at
     24:12-26:6.)

government agency bonds and mortgage backed securities and said that the Fund provided a return of 7.48% plus a 5% bonus that was subject to change. (Id.) While he does not recall if Cowan explained that the ABS Fund invested in CMOs; however, upon his review, the PPM stated that the Fund would invest in CMOs. (Id.) Based on Cowan's representations, he believed the investment was safe since they were government agency bonds. (Id.) Cowan also told him that ABS Fund managers had previous experience investing in government agency bonds and that Price "previously interacted with contacts at Goldman Sachs who had experience with investing in government agency bonds." (Id.) In addition, at least one investor understood that the principal and interest payments were "guaranteed" by Ginnie Mae and that he expected that he would receive 100% of his principal back in addition to monthly "returns" paid by Defendants. (Id., Ex. 40, Dewan Depo. at 42:16-44:17; 44:20-47:15; 52:17-53:19; 58:20-59:2.) He believed the investment was safe because they were backed by Ginnie Mae. (Id.)

However, Dewan also stated that he was told by Price, prior to the date he made his investments, that the Fund was investing in an IO strip of a CMO. (Dkt. No. 73-3, Dewan Depo. at 49:6-23.) Price also explained the risk as to the interest and that the rate of return was probably going to be LIBOR inversed. (Id. at 59:3-11.) He understood that it was possible that the interest rate might fluctuate. (Id. at 59:13-16.) He also testified that he knew that the rate of return that was calculated in the offering documents was always based on his capital contribution and not on the value of the underlying bond. (Id. at 191:17-25.)

Defendants also present the declarations of two investors who state they fully understood the type of investment and the risks of IOs as they were disclosed by Price. (Dkt. No. 73-3, Price Decl., Ex. F, Flagg Decl.; Dkt. No. 73-3, Price Decl., Ex. G, Murch Decl.)

Dan Flagg was a financial advisor to Peter Kern, an investor. (Dkt. No. 73-3, Price Del., Ex. F., Flagg Decl. ¶ 2.) Prior to investing, Kern and Flagg talked with

[13-319-GPC(BGS)]

Price about the Capital Access Fund.  (Id. ¶ 3.)  Price sent written materials including, investor suitability forms, the PPM, an investor's guide to CMOs and other related materials.  (Id.)  Kern decided to invest $2 million in May 2012, over $4 million in July 2012 and $2.5 million in September 2012 into the Fund.  (Id. ¶ 4.)  At the time, they understood that Kern was purchasing interests in a limited liability company that would be purchasing CMOs of varying risks in odd lot transactions.  (Id.)  They understood that the Fund was investing in IO versions of agency CMO bonds and understood that factors, such as a change in the one month LIBOR that could cause fluctuations in value.  (Id. ¶ 5.)  They expected to receive a preferred return on a monthly basis between 7.48 and 12.5% of the capital contributions made by Kern and they understood that the rates did not take into account the actual value of the securities owned by the Fund at any given time.  (Id. ¶ 8)  They understood the higher risk but opted due to the potential higher yield.  (Id. ¶ 5.)  They also understood that the preferred return was not guaranteed and that Kern could lose his total investment.  (Id. ¶9.)  Price explained that the Fund made odd lot purchases and it was difficult to value these types of CMOs once purchased.  (Id.)  Price's employment history was not a factor in Kern's decision to invest.  (Id. ¶ 6.)

Another investor, Jack Murch met Price at the Online Trading Academy where Price made an educational presentation about different types of bonds.  (Dkt. No. 73-3, Price Decl., Ex. F, Murch Decl. ¶ 6.)  Subsequently, Murch attended three to four more presentations regarding bonds and stocks and established a relationship with Price.  (Id. ¶ 7.)  He inquired whether Price was involved with these types of assets.  (Id.)  Price provided him with market data and educational materials about agency bonds and CMOs.  (Id. ¶ 8.)  Murch decided to invest $100,000 into ABS Fund Arizona in November 2009.  (Id.)  Later, he invested another $100,000.  (Id.)  Price's employment history was not a factor in his decision whether to invest in ABS Fund Arizona.  (Id. ¶ 10.)  He was informed the Fund was a high risk start-up type of offering.  (Id.)  He understood that he was purchasing limited liability company units and that the Fund

would be purchasing high risk securities such as different types of CMOs including various IOs. (Id. ¶11.) He understood that the values of the units may not change even though the values of the underlying securities owned by the Fund would. (Id. ¶ 12.) Murch understood that he expected to receive a preferred return of 18% per year on his unreturned capital contributions and that the rates did not take into account the underlying value of the assets owned by the Fund. (Id. ¶¶13, 14.) He recognized the risk because he wanted a greater return that would not have been earned from a lower risk type of CMO. (Id. ¶ 15.) He understood that the account statement was a snapshot of the various securities but no values were listed for those securities as they were provided for illustrative purposes only. (Id. ¶ 17.) He had conversations with Price over the years and was told that some bonds had gone up drastically and some had gone down but overall the portfolio was able to meet its obligations to pay him the 18% interest. (Id. ¶ 18.) Price also testified that he verbally disclosed to investors in ABS Fund California that its investments would consist of IO tranches of CMOs. (Dkt. No. 73-3, Ex. B, Price Depo. at 247:16-20; 248:18-21; 249:13-18.)

Defendants also state that they also provided written disclosures such as the Investor's Guide to Collateralized Mortgage Obligations, which was provided to investors in person and this information was also on the Fund's website. (Dkt. No. 73-2, Price Decl. ¶ 9; Dkt. No. 64-3, Dean Decl., Ex. 7.)

These declarations, testimony and email raise issues of disputed material facts as to whether Defendants disclosed that the Funds would invest in IOs and Inverse IOs and the risks associated with those types of investments.

Plaintiff also alleges that Defendants falsely claimed that the IOs and Inverse IOs Funds were "guaranteed", "safe & reliable bonds" and that Funds' "number one goal [was] preserving Capital" in the radio program, Wealth Weekend Hour and a power point presentation. (Dkt. No. 64-3, Dean Decl., Ex. 6 at 12, 24; Ex. 17 at 2; Ex. 37, Price Depo. at 154-55.) Defendant argues that such statements are forward looking statements and are protected by the "bespeaks caution" doctrine. Plaintiff argues that

[13-319-GPC(BGS)]

the doctrine does not apply as it applies to forward looking statements, not current statements.

The bespeaks caution doctrine "provides a mechanism by which a court can rule as a matter of law that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." Livid Holdings, Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 947 (9th Cir. 2005) (quoting In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1408 (9th Cir. 1996)). We have applied the bespeaks caution doctrine in situations where "optimistic projections coupled with cautionary language . . . affect[ ] the reasonableness of reliance on and the materiality of those projections." In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1414 (9th Cir. 1994). Plaintiff alleges misrepresentations as to past and present statements, and not the future. Therefore, the bespeaks caution doctrine does not apply in this case. However, there is a disputed issue of fact as to whether the investors heard these statements and whether they were material.

### c.   Defendants Misrepresented Price's Experience

The SEC alleges that Defendants affirmatively misrepresented Price's working experience falsely claiming that he had worked at Goldman Sachs and was a trader at Wells Fargo and specialized in mortgage-backed bonds. In opposition, Price states that he was an independent contractor at Goldman Sachs and that he was a branch manager at Wells Fargo; he states he did not allege that he specialized in mortgage- backed bonds while at Wells Fargo.

The Capital Access Fund website described Price as "structuring the buying and selling of mortgage pools on the secondary market for Wells Fargo and locat[ing] hard to find assets with small institution banks as a consultant for Goldman Sachs." (Dkt. No. 64-3, Dean Decl., Ex. 12 at 8.) On the Wealth Weekend Hour radio program, Price stated:

> I started at Wells Fargo Bank as a branch manager several, several years ago, and went from there to working with Goldman as [sic] independent contractor dealing with REOs and foreclosed homes portfolios, getting them sold, things of that nature. . . .

(Dkt. No. 64-3, Dean Decl., Ex. 6 at 7-8.)  The Funds' PPMs state the Price held the position of Branch Manager at Well Fargo and then progressed to the position of Manager of Mortgage Resources for 23 retail branches where he became familiar with high-yield return investments on the secondary market.  (Id., Ex. 1 at 22; Ex. 2 at 20; Ex. 3 at 9-10.)  The PPMs also similarly state that he was hired as a consultant for Goldman Sachs and became an independent contractor for Goldman Sach's asset management department where he was responsible for the buying and selling of mortgage pools worth hundreds of millions of dollars.  (Id.)

Plaintiff presents a declaration from the Vice President within the Human Capital Management Division of Goldman Sachs where he states that there is no record of Price's employment as an employee, consultant or independent contractor.  (Dkt. No. 64-3, Dean Decl., Ex. 31.)  Moreover, at Wells Fargo he was a Subprime Branch Sales Manager and worked in mortgage origination.  (Id., Ex. 30.)[4]  He was not involved in trading mortgage backed securities or in the securitization of mortgages.  (Id.)

In opposition, Price states that he worked for Goldman Sachs as an independent contractor and/or consultant and other large institutions interested in purchasing securities and various other types of CMOs prior to forming ABS Fund, LLC.  (Dkt. No.73-2, Price Decl. ¶ 20.)  At Wells Fargo, he states he was a Branch Manager in their Mortgage Resources division.  (Id. ¶ 21.)

The description on the Capital Access Fund website as to Price's work at Wells Fargo was false since he did not "structure the buying and selling of mortgage pools

---

[4]Defendants object and move to strike the Declaration of Peter DeLanoit arguing that he does not have any personal knowledge of Price or of his job responsibilities at Wells Fargo Bank and that DeLanoit does not have any personal knowledge of the contents and documents submitted in support of his declaration.  (Dkt. No. 72.)  Plaintiff opposes.  (Dkt. No. 77-17.)  DaLanoit states the he has personal knowledge of the matters set forth and he is Senior VP in Human Resources with 16 years experience at Wells Fargo.  (Dkt. No. 64-3, Dean Decl., Ex. 30.) The Court concludes that the declaration establishes a basis for his knowledge about the human resources files he reviewed.  Accordingly, the Court overrules Defendants' objection and DENIES their motion to strike the Declaration of Peter DaLanoit.

1    on the secondary market for Wells Fargo." It is not clear whether the other descriptions

2    of Price's past work experience was misleading; however, Plaintiff must show that

3    these misleading statements were material.

4         Plaintiff has presented one investor, Bradford Dewan who stated that Price's

5    work experience at Wells Fargo and Goldman Sachs would have affected his decision

6    to invest.  (Dkt. No. 64-3, Dean Decl., Ex. 40, Dewan Depo. at 56:13-58:6.) In

7    opposition, Defendants present the declarations of Flagg and Murch who state that

8    Price's employment history was not a factor in their decision to invest. (Dkt. No. 73-3,

9    Price Decl., Ex. F., Flagg Dec. ¶ 6; Dkt. No. 73-3, Price Decl., Ex. F, Murch Decl. ¶

10   10.)  Accordingly, there is a disputed issue of material fact as to whether Price's past

11   work experience was material to investors.

12               **d.    Defendants Misrepresented Assets under Management**

13        The SEC alleges that Defendants overstated the assets under management as

14   much as three times and this would have affected one investor's decision to invest.

15   Dewan testified that the amount of assets under management reported in the PPM gave

16   him a little comfort in the sense that "there happened to be other investors besides

17   myself. So it would give a little more credibility." (Dkt. No. 64-3, Dean Decl., Ex. 40,

18   Dewan Depo. at 54:11-55:2.) Defendants dispute the term "assets under management"

19   as that term does not appear in the 2012 spreadsheet referenced by Plaintiff.

20   Defendants state that this spreadsheet does not provide any information about current

21   values of assets under management but only provides the amount of each investor's

22   capital contribution.  (Dkt. No. 73-2, Price Decl.¶  22.)

23        The ABS California Fund's PPM stated that the Fund had "company owned

24   assets" of $62.4 million as of June 1, 2010.  (Dkt. No. 64-3, Dean Decl., Ex. 2 at 11.)

25   In addition, ABS Manager's website stated that "ABS Fund has grown to having $72

26   million assets under management as of May 2011."  (Id., Ex. 27 ¶ 5.)  However, the

27   November 2012 spreadsheet reflects total assets under management of $17,435,462.

28   (Id., Ex. 5.)  In 2013, Price stated in an email that ABS Manager had $18 million assets

1  under management.  (Dkt. No. 64-3, Dean Decl., Ex. 48.)

2

3      Again, there is a disputed issue as to the definition the parties use of "assets

4  under management" Neither party properly defines total assets under management.

5  Accordingly, there is a disputed issue of material fact as to whether Defendants

6  misrepresented assets under management.[5]

7      **2.   Scienter**

8      "A plaintiff cannot recover without proving that a defendant made a material

9  misstatement *with an intent to deceive* –not merely innocently or negligently." Merck

10  & Co., Inc. v. Reynolds, 559 U.S.633, 649 (2010).  In the Ninth Circuit, the meaning

11  of scienter is similar in section 10(b), Rule 10b-5, and section 17(a)(1).  Vernazza v.

12  SEC, 327 F.3d 851, 860 (9th Cir. 2003).  Scienter may be supported by "knowing or

13

14  [5]Plaintiff also raises facts surrounding the liquidation of the Funds' CMOs that
were held by Morgan Stanley.  In June 2012, Capital Access began to allow investors
to obtain a line of credit from ABS Manager for up to 70% of the value of their
15  investment in Capital Access.  ABS Manager obtained a "non-purpose loan" from
Morgan Stanley, its broker-dealer and clearing firm.  Plaintiff alleges and Defendants
16  dispute that Defendants falsified the loan application for the line of credit claiming
Price intended to use the proceeds to purchase commercial and residential real estate.
17  The facility was collateralized by the IOs and Inverse IOs held by the Funds.  Plaintiff
alleges that the addition of the line of credit to the Fund's brokerage account
18  heightened the risk to investors because it made the account susceptible to a "margin
call" which was realized at the end of 2012.  At the end of 2012, Morgan Stanley Smith
19  Barney requested that the Fund moves its account and requested a transfer to a different
firm by the end of January 2013.  Defendants were unable to locate another broker so
20  in February 2013, all the assets of Capital Access were liquidated by Morgan Stanley.
According to Plaintiff, investors did not seem to understand Morgan Stanley's ability
21  to call the loan and liquidate the underlying collateral and Defendants have not been
honest with them about the events related to this liquidation.  As a result, all the
22  investors in Capital Access suffered a total loss.
        In opposition, Defendants assert that the line of credit did not heighten the
23  investors' risk but lowered the risk of investment losses for the investors who used the
line of credit as it was not allowable to be clawed back and the investor held no
24  liability for any shortfalls. This was stated in the PPMs and margin disclosure
documents provided to investors. The line of credit was considered as a payment of
25  principal back to the investors, thus lowering the exposure of outstanding investments
to only 30%.  They also dispute representations made to Morgan Stanley as to the
26  purpose of the line of credit.  Price states that he opened the line of credit to acquire
real estate and bonds.  (Dkt. No. 73-2, Price Decl. ¶¶ 25-29.)  Defendants have
27  presented evidence to create a genuine issue of material disputed fact as to whether
there were misrepresentation as to the liquidation of the Funds' CMOs with Morgan
28  Stanley.

reckless conduct" without a showing of "willful intent to defraud."  Id. (citing Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir.1978); see also Howard v. Everex Sys., Inc., 228 F.3d 1057, 1063 (9th Cir. 2000).   Scienter is satisfied by recklessness.  Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568–69 (9th Cir. 1990).  Reckless conduct is conduct that consists of a highly unreasonable act, or omission, that is an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Id. at 1569.

Plaintiff asserts that Price, as the sole manager and CEO of ABS Manager, knew or was reckless in not knowing that the misrepresentations and omissions made by the Defendants were false. Price managed the Funds' investments and he knew they were only reporting the interest rate and not the underlying value of the assets.  Defendants argue that based on the advice and reliance on outside third-party professionals, they reasonably believed that information was being accurately transmitted to the investors; and there are disputed issues of fact regarding the value of the bonds.

Here, as discussed above, there is a genuine disputed issue of material fact as to whether these representations and omissions were violations of the securities laws. While Plaintiff believed that his method of valuating the returns was correct, there is a genuine issue of fact as to whether it was reckless conduct.

Based on the above, the Court DENIES Plaintiff's motion for summary judgment on the anti-fraud causes of action pursuant to the Securities Act and the Exchange Act.

**B.    Section 17(a)(2) and 17(a)(3) of the Securities Act**

The SEC also moves for summary judgment as to sections 17(a)(2) and 17(a)(3) of the Securities Act. Defendants oppose.

Sections 17(a)(2) and 17(a)(3) does not require a finding of scienter but requires a showing of negligence.  Rauscher, Inc., 254 F.3d at 856; see also Aaron v. SEC, 446 U.S. 680, 696–702 (1980).

Here, as there are material issues of disputed fact as to whether the elements of

the antifraud provisions of the securities law, the Court also DENIES Plaintiff's motion for summary judgment on sections 17(a)(2) and 17(a)(3) of the Securities Act.

**C.     Section 20(a) of the Exchange Act - Control Person Liability**

The SEC moves for summary judgment under the control person liability contending that Price controlled and exercised power over Defendant ABS Manager. Defendants oppose arguing that since there is a genuine issues of material fact as to whether they violated the Exchange Act, Plaintiff's motion for summary judgment should be denied.

Section 20(a) of the Exchange Act provides,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ."

15 U.S.C. § 78t(a). A defendant may be liable for securities violation if (1) there is a violation of the Exchange Act and (2) the defendant directly or indirectly controls any person liable for the violation. SEC v. Todd, 642 F.3d 1207, 1223 (9th Cir. 2011). The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; Todd, 642 F.3d at 1223 n.4. The definition of "person" under the Act encompasses a "company." Todd, 642 F.3d at 1223 (citing 15 U.S.C. § 78c(a)(9)).

As there is a genuine issue of material fact as to whether there was a violation of the Exchange Act, the Court DENIES the SEC's Motion for Summary Judgment with regard to this cause of action.

**D.     Sections 206(1) and 206(2) of the Advisors Act, 15 U.S.C. 80b-6(1) and (2) (fraud by an investment advisor); Section 206(4) of the Advisers Act, 15 U.S.C. 80b-6(4) and Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8**

The SEC moves for summary judgment that Defendants violated sections 206(1),

206(2), and 206(4) of the Investment Advisers Act, and accompanying Rule 206(4)-8. Defendants also move for summary judgment that they are exempt under the Investment Advisers Act.

Sections 206(1) and 206(2) provide:

> [i]t shall be unlawful for any investment adviser . . . (1) to employ any device, scheme, or artifice to defraud any client or prospective client; [or] (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

15 U.S.C. § 80b-6(1); 15 U.S.C. § 80b-6(2).  Section 206(4) and Rule 275.206(4)-8 prohibit the same conduct but as it relates to pooled investment vehicles.  15 U.S.C. § 80b-6(4); 17 C.F.R. § 275.206(4)-8.  The definition of investment adviser is as follows:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include . . . (E) **any person whose advice, analyses, or reports relate to no securities other than securities which are direct obligations of or obligations guaranteed as to principal or interest by the United States,** or securities issued or guaranteed by corporations in which the United States has a direct or indirect interest which shall have been designated by the Secretary of the Treasury, pursuant to section 3(a)(12) of the Securities Exchange Act of 1934 [15 U.S.C.A. § 78c(a)(12)], as exempted securities for the purposes of that Act [15 U.S.C.A. § 78a et seq.] . . . ."

15 U.S.C. § 80b-2(a)(11)(E) (emphasis added).

Plaintiff argues that Defendants were investment advisers subject to the Investment Advisers Act.  Defendants engaged in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing or selling securities.  Moreover, ABS Manger even applied to be registered as an investment adviser in California, and ABS Manager and Price, its sole manager, managed the Funds and their investments and were compensated for it in the form of a management fee.  The SEC also alleges Defendants violated section 206(4) and Rule 275.206(4)-8 which prohibit the same conduct as sections 206(1) and 206(2) but in connection with

[13-319-GPC(BGS)]

1    "pooled investment vehicles."

2          In their motion for partial summary judgment, Defendants argue that they

3    provided management services to the Funds as to the Funds' securities which solely

4    consisted of Agency CMOs and IOs which fall within the exclusion of the definition

5    of Investment Adviser.  Moreover, they contend that they were managers, not advisers.

6          In opposition, Plaintiff asserts that contrary to Defendants' allegations that the

7    Funds' securities consisted solely of Agency CMOs and IOs, at least one was a non-

8    Agency CMO.  Defendants purchased 1 private CMO bond, issued by Countrywide.

9    The bond, CWALT 2005-J10 Class 1A14 has CUSIP No. 12668ABL8 and was an

10   inverse IO bond.  (Dkt. No. 71-9, Weiner Decl. ¶¶ 2-5; Exs. 1-2.)  It appeared for the

11   first time in the May 2009 Andrew Garrett account statement for ABS Arizona and sold

12   on April 11, 2011.  (Id.)

13         Moreover, Defendants offered investment advisory services to investors about

14   two different types of securities, the Agency CMOs and private bonds.  For example,

15   the 2009 PPM for the ABS Arizona Fund states:

16         The Fund expects to invest only in certificates tied to residential
           mortgages with the following characteristics: Government National
17         Mortgage Association backed Bonds with Guaranteed payments by the
           Treasury Department, OR borrowers with a minimum of 720 credit
18         scores, loans with at least 18% equity, a history of limited defaults, and
           AAA rating.
19

20   (Dtk. No. 64-14, Ex. 68 at SEC-MAJ-0000399.)  The SEC argues that Defendants held

21   themselves out as trading in government and private mortgage backed securities.

22         In reply, Defendants state that the Countrywide bond was purchased by Relief

23   Defendant Cavan Private Equity Holding, LLC in November 2008, prior to the

24   existence of the ABS Arizona Fund's 2009 startup date, and it was for personal use and

25   not intended to be purchased for the Fund.  (Dkt. No. 76, CSAMF, Ex. A, Price Decl.

26   ¶¶ 2, 3; see also, Ex. 1.)  All monies contributed by investors for all new securities were

27   used to purchase Agency CMOs.  (Id. ¶ 4.)  Price testified that 100% of the assets

28   purchased by ABS Fund California and Capital Access Fund were IO tranches of

1   CMOs. (Dkt. No. 73-3, Ex. B, Price Depo at 249:5-12.) Investors understood that the

2   Fund intended to invest in Agency CMOs. (Dkt. No. 76, CSAMF, Ex. B, Dewan Tr.

3   at 53:23-54:18.)

4        Defendants also allege they were managers of the Funds, not investment

5   advisers. At least two investors stated that no one from Defendant ABS Manager

6   represented themselves as investment advisers, (Dkt. No. 76, Ex. B, Chester Decl., Ex.

7   3, Nittoli Depo., 120:5-7; Ex. 2, Dewan Depo. at 137:10-12), while another investor

8   acknowledged his understanding that the Capital Access, LLC Fund was not a

9   registered investment advisory company and that its officer, directors and manager

10  have no ability to offer any sort of investment advice and they never represented to be

11  an investment adviser. (Id., Chester Decl., Ex.4; Necomb Decl. ¶7).

12       While the PPMs state that the Funds would invest in either agency bonds and

13  private bonds, there is no additional evidence provided by Plaintiff that Defendants

14  informed investors that they would invest in "private mortgage backed securities."

15  While the definition of investment advise can be in the form of "writings", such as the

16  PPMs, it should also involve "advising others" "as to the value of securities or as to the

17  advisability of investing in, purchasing, or selling securities." See 15 U.S.C. § 80b-

18  2(a)(11)(E). Besides one documents, Plaintiff has presented no contrary evidence that

19  Defendants informed investors that they would invest in private mortgage backed

20  securities. The evidence reveals verbal and written communications by Defendants

21  that solely addressed Agency CMOs and all statements concerning the Funds such

22  "guaranteed", "safe and reliable" were referencing Agency bonds. Accordingly, the

23  Court concludes that Defendants are exempt from the Investment Advisers Act under

24  the exception as provided in the definition of investment adviser. See 15 U.S.C. § 80b-

25  2(a)(11)(E).

26       Accordingly, the Court DENIES Plaintiff's motion for summary judgment and

27  GRANTS Defendants' motion for partial summary judgment as to the first two causes

28  of action under sections 206(1), 206(2) and 206(4) of the Investment Advisers Act and

1  Rule 206(4)-8. .

2  **E.     Evidentiary Objections**

3       Plaintiff filed evidentiary objections.  (Dkt. No. 77-18.)  The Court notes its

4  objections.   To the extent that the evidence is proper under the Federal Rules of

5  Evidence, the Court considered the evidence.  To the extent that the evidence is not

6  proper, the Court did not consider it.

7  **F.     Defendants' Motion to Set Aside Default**

8       Defendants move to set aside the default entered against Relief Defendants

9  Cavan Private Equity Holdings, LLC ("Cavan") and Lucky Star Events, LLC ("Lucky

10  Star").  While Cavan and Lucky Star have not answered the complaint, they have been

11  "otherwise defending" the lawsuit.  Plaintiff opposes arguing that ABS Manager and

12  Price improperly have moved to set aside default instead of Cavan and Lucky Star.

13  Second, SEC argues that they have never appeared in this matter and it is their culpable

14  conduct that led to the entry of default.[6]

15       On January 15, 2014, Plaintiff moved for default as to Cavan and Lucky Star.

16  (Dkt. No. 58.)  Default was entered on January 16, 2014 for failure to "plead or

17  otherwise defend."  (Dkt. No. 59.)  Defendants note that while there are five Relief

18  Defendants, Plaintiff only sought default as to two of them.  Cavan is owned by

19  Defendant Price and Lucky Star is owned by Price's wife.  According to the Complaint,

20  the SEC alleges that the Funds improperly paid management fees to Lucky Star and

21  Cavan.  In this case, the personal and legal interests of Defendants are closely tied and

22  aligned with the Relief Defendants. Therefore, while Defendants filed the motion

23  instead of Lucky Star and Cavan, the Court will allow the motion considering the close

24  knit relationship between all defendants.

25  _____

26      [6]SEC also argues that the motion is not even timely, as it was filed on April 1,
   2014, past the March 28, 2014 motion cut-off date.  Defendants maintain that clerical
27  errors caused the delay.  As noted on the docket, Defendants attempted to file their
   motion to set aside default on March 28, 2014; however it was stricken due to failure
   to obtain a hearing date.  (Dkt. Nos. 63, 65.)  Due to the clerical error, the Court
28  concludes that Defendants' motion is timely.

According to Federal Rule of Civil Procedure 55(c), "[t]he court may set aside an entry of default for good cause . . . ." Fed. R. Civ. P.  55(c).  The good cause standard under Rule 55(c) is identical to the standard governing vacating a default judgment under Rule 60(b).  Franchise Holding II, LLC v. Huntington Rests. Group, Inc., 375 F.3d 922, 925 (9th Cir. 2004); TCI Group Life Ins. Plan v. Knoebber, 244 F.3d 691, 696 (9th Cir. 2001).  The decision to set aside an entry of default is at the discretion of the trial court judge.  Brandt v. American Bankers Inc. Co. of Florida, 653 F.3d 1108, 1110 (9th Cir. 2011).  The moving party bears the burden of showing the following factors: (1) whether the defendant engaged in culpable conduct that led to the default; (2) whether the defendant has a meritorious defense; and (3) whether lifting the default would prejudice the plaintiff.  Franchise Holding II, 375 F.3d at 926. "Default is not to be freely granted, however, as "a case should, whenever possible, be decided on the merits." TCI Group, 244 F.3d at 697.

Defendants argue they did not engage in culpable conduct as they have been defending the case.  Both entities are subject to and complying with the preliminary injunction order issued by this Court which included a wide array of equitable orders to maintain the status quo, and to provide accountings to the SEC. (Dkt. No. 35.) Price has also appeared and defended the claims in this case including those involving the Relief Defendants.  Plaintiffs maintain that Cavan and Lucky Star engaged in culpable conduct by not answering the complaint once they had notice of the lawsuit when Mr. Chester, counsel for Defendants, accepted service of the complaint on their behalf. Based on the proceedings in this case, the Court concludes the Defendants did not engage in culpable conduct as they have been involved in defending this case.

Defendants contend there is a genuine issue of fact whether the funds transferred to Cavan and Lucky Star were wrongfully received based on ill gotten gains and whether they were entitled to pay themselves.  SEC argues that Cavan and Lucky Star failed to produce competent evidence that they have a meritorious defense to the claim that they are in possession of investor money that was wrongfully transferred to them

by Defendants.  As discussed above on Plaintiff's motion for summary judgment, there is a genuine issue of disputed material fact whether Defendants violated the securities laws.  As such, this factor weighs in favor of Defendants.

Defendants further contend that the SEC will not be prejudiced because the SEC has been conducting discovery as to these Relief Defendants.  In opposition, SEC argues it will be prejudiced because it will be hindered in its ability to conduct discovery as to these relief defendants.  When the SEC attempted to take the deposition of Lucky Star, Chester indicated he was not counsel for Lucky Star, so it spent weeks attempting to effect service of a deposition notice.  When it became clear that Lucky Star was evading service, the SEC decided that it would simply take defaults of Cavan and Lucky Star.  Plaintiff contends that Defendants waited several months until April 1, 2014 to move to set aside the defaults.

In reply, Defendants assert that Plaintiff has conducted discovery as the Relief Defendants.  While the deposition of Mrs. Price was not yet conducted, it was not due to Defendants.  Defense counsel, Mr. Chester, informed the SEC that a representative from Lucky Star and its counsel were available for deposition on November 5th or 6th; but SEC never responded and did not take further action to obtain a deposition.  As for Cavan, the SEC did not issue a deposition subpoena specifically for Cavan because it deposed Cowan and Price, who are also representatives of Cavan.   Moreover, Defendants produced documents to the SEC related to Cavan.  The Court concludes that the SEC will not be prejudiced as it has conducted discovery as to Cavan and appears to only need to depose Lucky Star's representative.

Both parties have been litigating the case even though the Relief Defendants never filed an answer.  The Complaint was served on February 22, 2013.  It was not until January 15, 2014, almost a year later, that the SEC moved for entry of default.  Then it was not until April 1, 2014 that Defendants moved to set aside the default.  When it became difficult to schedule the deposition of Mrs. Price, the SEC sought entry of default.

1    Based on the fact that Relief Defendants Cavan and Lucky Star were otherwise

2    defending the lawsuit, the Court finds good cause and grants Defendants' motion to set

3    aside the defaults entered against Cavan and Lucky Star.  While Defendants argue that

4    the claims against Relief Defendants are not ripe until the Court determines that

5    Defendants misappropriated funds and transferred those ill gotten gains to Cavan and

6    Lucky Star, or that they have been "otherwise defending the case" by participating in

7    discovery, that does not preclude them from filing an answer.  According to the Federal

8    Rule of Civil Procedure 12(a), Relief Defendants must file an answer to the complaint.

9                                    **Conclusion**

10    Based on the above, the Court DENIES Plaintiff's motion for summary judgment

11    on all causes of action; GRANTS Defendants' motion for partial summary judgment

12    as to the first two causes of action; and GRANTS Defendants' motion to set aside

13    default against Relief Defendants Cavan Private Equity Holdings, LLC and Lucky Star

14    Events, LLC.  Relief Defendant Cavan and Lucky Star shall file an answer within seven

15    (7) days from the date this order is "filed."  While the other Relief Defendants are not

16    before the Court on motion, the Court recommends that the other Relief Defendants

17    also file an answer.  The hearing set for June 13, 2014 shall be **vacated.**

18    IT IS SO ORDERED.

19

20    DATED:  June 11, 2014

21

22    HON. GONZALO P. CURIEL
      United States District Judge

23

24

25

26

27

28